IN THE MATTER OF THE WILL OF JOHN A. JONES, JR.

No. 37A08

(Filed 12 December 2008)

**Wills— undue influence by spouse—issue of fact**

There was a genuine issue of undue influence in a case involving two wills and an allegation of undue influence over the mortally ill decedent by his wife of 47 years, given the evidence of the relevant factors and the entire combination of facts, circumstances, and inferences.

Appeal pursuant to N.C.G.S. § 7A-30(2) from the decision of a divided panel of the Court of Appeals, 188 N.C. App. 1, 655 S.E.2d 407 (2008), affirming entry of summary judgment for caveator on 20 October 2006 by Judge Knox V. Jenkins, Jr. in Superior Court, Johnston County. Heard in the Supreme Court 5 May 2008.

*Brady, Nordgren, Morton & Malone, PLLC, by Travis K. Morton and Jason L. Hendren, for propounder-appellant Joseph B. McLeod.*

*Smith Debnam Narron Drake Saintsing & Myers, L.L.P., by John W. Narron, Bettie Kelley Sousa, and Alicia Jurney Whitlock, for caveator-appellee Jean L. Jones.*

HUDSON, Justice.

This case involves a dispute over a will executed on 1 September 2005 by testator John "Buck" Jones, Jr. and whether that will was the product of undue influence exerted upon Mr. Jones by his wife of forty-seven years, Jean L. Jones. Because we believe genuine issues

**IN RE WILL OF JONES**

[362 N.C. 569 (2008)]

of material fact remain as to the question of undue influence, we reverse the Court of Appeals, which, in a divided opinion, affirmed the trial court's grant of summary judgment to Mrs. Jones and its order for the will to be accepted for probate. We also instruct the Court of Appeals to remand to the trial court for further proceedings not inconsistent with this opinion on the issues of undue influence and *devasivit vel non.*

On 11 October 2005, Mr. Jones, a Johnston County resident, died at the age of seventy-six, survived by his wife and no linear descendants. Prior to the will he executed on 1 September 2005 ("September Will"), Mr. Jones executed a will and trust agreement on 3 March 2005 ("March Will"); none of the beneficiaries was present at the signing. In the March Will, executed after a February 2005 meeting with attorney Michael S. Batts and his law partner, Mr. Jones directed that all household items, his farming operation, his domesticated animals, his gun collection, and any remaining personal effects be distributed outright to Mrs. Jones upon the event of his death. He also specifically devised certain cattle to Robert Fowler, with whom he had a longstanding friendship and partnership for cattle breeding and sales.

The March Will further provided that the residue of the estate, including Mr. Jones's shares in Carolina Packers, Inc., a closely held meatpacking company in Smithfield, North Carolina, started by Mr. Jones's father and of which Mr. Jones was president and majority shareholder, go into a trust for Mrs. Jones's benefit during her life. Joseph B. McLeod, who had provided tax and accounting services for both Carolina Packers and Mr. Jones since 1988, was named trustee. Upon Mrs. Jones's death, the stock was to be delivered to three long-time Carolina Packers employees, Kent Denning, Johnny Hayes, and Lynette Thompson. Mr. Jones also named Mr. McLeod the executor of the March Will. According to evidence in the record, Mr. Jones was in decent health, ambulatory, and still working at Carolina Packers at the time he signed the March Will. According to Mr. Batts, Mr. Jones specifically stated that he wanted his wife taken care of but did not want her to have control of Carolina Packers, and he described the terms of the March Will as being "exactly what I want."

In the September Will Mr. Jones expressly "revoke[d] all earlier wills and codicils" and left close to the entirety of his estate to Mrs. Jones outright, including the cattle previously devised to Mr. Fowler. The September Will also directed that the residue of the estate be placed in a trust; although the trust documents do not appear in the record, the parties' briefs to this Court suggest that the September

**IN RE WILL OF JONES**

[362 N.C. 569 (2008)]

Will gave Mrs. Jones control of Carolina Packers. She was also named executrix of the September Will.

Between the signing of the March Will and the September Will, Mr. Jones began "a steady downhill course" in April 2005, apparently related to the cancer with which he had been diagnosed in 2004. In late July 2005, Mr. Jones visited Rex Hospital's emergency room due to "pain [and] confusion," and CT scans at that time showed multiple metastatic deposits or tumors in his brain. According to Dr. Leroy G. Hoffman, Mr. Jones's treating oncologist during August and September 2005, such tumors can cause confusion, and a doctor's notes from that emergency room visit reflect that Mr. Jones was indeed "profoundly weak and confused," with Mrs. Jones "serving as his surrogate decision-maker." Mr. Jones's diagnosis at that time, of which Mrs. Jones was "very aware," was terminal.

Deposition testimony and affidavits from longtime friends and acquaintances of Mr. Jones further indicate that he was suffering from intense pain, exhaustion, and confusion during the summer of 2005. Kent Denning, who had worked at Carolina Packers for approximately twenty years, recalled Mr. Jones exhibiting signs of confusion in the office at that time, resulting in having to take Mr. Jones home. Also in July, Mr. Fowler observed Mr. Jones take more than the prescribed amount of narcotic pain medication while the two men were fishing together. Mrs. Jones stated that Mr. Jones had experienced difficulties regulating his pain prescription beginning in late June and through part of the summer of 2005.

On or about 1 August 2005, Mr. Jones underwent "a thoracic lumbar laminectomy" to relieve pain and pressure from a tumor pressing against his spine. Dr. Hoffman testified that when "someone's admitted to the hospital for an episode like this . . . with the medications they're taking, the postoperative setting, there can be confusion. . . . There may [also] be some emotional stress going on. You'd most likely think there was." Following his release from the hospital in early August, Mr. Jones became a "total care" patient, relying heavily on others, especially Mrs. Jones, to assist him with his medication, getting out of bed, shaving, bathing, eating, and leaving home. He remained this way until his death in October.

During the months of August and September 2005, Mr. Jones was especially physically and mentally weak. According to good friend John Antunes, Mr. Jones looked and sounded increasingly weak and vulnerable, physically and mentally, during the summer of 2005 until

the time of his death. Attorney Michael Batts likewise described Mr. Jones as being worn down, exhausted, and completely dependent on Mrs. Jones when he met with them at their residence on 5 August 2005 to discuss potential changes to the March Will, which he had drafted. Mr. Fowler stated that during his August and September visits with Mr. Jones, he "appeared very weak, less alert, and he did not speak much." In a mid-August meeting with the Joneses regarding Mr. Jones's and Mr. Fowler's cattle dealing, Mr. Fowler recalled that Mrs. Jones controlled the conversation, even though Mr. Fowler had never known Mr. Jones to involve his wife in these matters. He also believed that Mr. Jones appeared "weak, sick, and defeated."

Wayne Sinclair, a close friend of Mr. Jones for over ten years and a witness to the March Will, stated that he saw Mr. Jones nearly every day during 2005. Between August and September 2005, he observed Mr. Jones's health, strength, and mental ability, including his sharpness and alertness, rapidly decline, and he often helped Mr. Jones shave and bathe. According to Mr. Sinclair, Mr. Jones stopped speaking much during his September visits, and he also saw Mr. Jones crying, which he had never before seen. Mr. Sinclair stated that "[b]y the end of August 2005, [Mr. Jones's] attitude and personality were greatly changed in that it appeared to [him] that he was not the same man. His spirit was gone and all of the fight was out of him by that point."

Finally, Dr. Hoffman saw Mr. Jones several hours after the September Will was executed. Dr. Hoffman stated that "it would be hard to not see some signs of depression in anyone who is in this state of cancer," and Mr. Jones "seemed to be somewhat depressed, which is understandable considering he has been an extremely active gentleman all his life." Dr. Hoffman further maintained, "I don't think he was the normal outgoing person or type of person he was six months ago. I didn't ever see him then, but I would imagine that there was some depression."

Following Mr. Jones's death, propounder Joseph McLeod submitted the March Will for probate on 14 October 2005. Shortly thereafter, Mrs. Jones filed a caveat to the March Will alleging that the September Will had expressly revoked the prior will and was therefore the valid last will and testament of Mr. Jones. Mr. McLeod was a propounder of the March Will and the caveator of the September Will; Mrs. Jones was the caveator of the March Will and the propounder of the September Will. On 20 October 2006, in response to Mrs. Jones's July motion for summary judgment, the trial court concluded that

there was no genuine issue of fact as to whether Mr. Jones was unduly influenced by Mrs. Jones in executing the September Will. Accordingly, the trial court granted summary judgment to Mrs. Jones and ordered the Clerk of the Superior Court in Johnston County to accept the September Will for probate.

Mr. McLeod appealed, arguing that the trial court committed reversible error in concluding that (1) the September Will was not executed under undue influence exerted by Mrs. Jones; (2) Mr. Jones had the testamentary capacity to execute the September Will; and (3) summary judgment on the issue of *devisavit vel non* was appropriate despite evidence of undue influence and lack of capacity. In a divided opinion, the Court of Appeals affirmed the trial court's grant of summary judgment as to each issue. *In re Will of Jones*, —— N.C. App. ——, ——, 655 S.E.2d 407, 419 (2008). The Court of Appeals majority concluded that Mr. McLeod had "failed to present specific facts showing that Mr. Jones's will was executed solely as a result of fraudulent and overpowering influence by Mrs. Jones that controlled Mr. Jones at the time he executed the documents." *Id.* at ——, 655 S.E.2d at 417. Moreover, Mr. McLeod had not "carried his burden of proving undue influence" and had "failed to show that Mr. Jones was susceptible to undue influence at the time he executed the September Will." *Id.* at ——, 655 S.E.2d at 416. Although the dissenting judge concurred on the issue of testamentary capacity, she disagreed as to undue influence and *devisavit vel non*, finding that Mr. McLeod had forecast sufficient evidence on those issues. *Id.* at ——, 655 S.E.2d at 422 (Stroud, J., concurring in part and dissenting in part). Based on the dissent, Mr. McLeod appeals to this Court.

Our standard of review of an appeal from summary judgment is de novo; such judgment is appropriate only when the record shows that "there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." *Forbis v. Neal*, 361 N.C. 519, 523-24, 649 S.E.2d 382, 385 (2007) (citations and quotation omitted). "When considering a motion for summary judgment, the trial judge must view the presented evidence in a light most favorable to the nonmoving party." *Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001) (citation omitted). If the movant demonstrates the absence of a genuine issue of material fact, the burden shifts to the nonmovant to present specific facts which establish the presence of a genuine factual dispute for trial. *E.g.*, *Lowe v. Bradford*, 305 N.C. 366, 369-70, 289 S.E.2d 363, 366 (1982) (citing N.C.G.S. § 1A-1, Rule 56(e)). Nevertheless, "[i]f there is any question as to the weight of evi-

dence summary judgment should be denied." *Marcus Bros. Textiles, Inc. v. Price Waterhouse, LLP*, 350 N.C. 214, 220, 513 S.E.2d 320, 325 (1999) (citing *Kessing v. Nat'l Mortgage Corp.*, 278 N.C. 523, 535, 180 S.E.2d 823, 830 (1971)).

In applying these well-established principles here, we must determine whether Mr. McLeod, as propounder of the March Will, forecast evidence of a prima facie case of undue influence sufficient to overcome Mrs. Jones's motion for summary judgment. This Court has previously defined "undue influence" as

> something operating upon the mind of the person whose act is called in judgment, of sufficient controlling effect to destroy free agency and to render the instrument, brought in question, not properly an expression of the wishes of the maker, but rather the expression of the will of another. "It is the substitution of the mind of the person exercising the influence for the mind of the testator, causing him to make a will which he otherwise would not have made."

> In short, undue influence, which justifies the setting aside of a will, is a fraudulent influence, or such an overpowering influence as amounts to a legal wrong. It is close akin to coercion produced by importunity, or by a silent, resistless power, exercised by the strong over the weak, which could not be resisted, so that the end reached is tantamount to the effect produced by the use of fear or force.

*In re Will of Turnage*, 208 N.C. 130, 131-32, 179 S.E. 332, 333 (1935). Thus, while undue influence requires "more than *mere* influence or persuasion because a person can be influenced to perform an act that is nevertheless his voluntary action," *In re Will of Andrews*, 299 N.C. 52, 53, 261 S.E.2d 198, 199 (1980) (internal citation omitted), it does not require moral turpitude or a bad or improper motive, *In re Will of Craven*, 169 N.C. 641, 649, 169 N.C. 561, 568, 86 S.E. 587, 591 (1915). Indeed, undue influence may even be exerted by a person with the best of motives. *Id.*; *see also In re Will of Turnage*, 208 N.C. at 132, 179 S.E. at 333. Nevertheless, influence is not necessarily "undue," even if gained through persuasion or kindness and resulting in an "unequal or unjust disposition . . . in favor of those who have contributed to [the testator's] comfort and ministered to his wants, [so long as] such disposition is voluntarily made." *In re Will of Craven*, 169 N.C. at 650, 169 N.C. at 569-70, 86 S.E. at 592 (citation omitted).

**IN RE WILL OF JONES**

[362 N.C. 569 (2008)]

Undue influence is an inherently subjective term, and finding its existence thus requires engaging in a heavily fact-specific inquiry. Indeed, we have noted the difficulty of making such a determination in past cases:

It is impossible to set forth all the various combinations of facts and circumstances that are sufficient to make out a case of undue influence because the possibilities are as limitless as the imagination of the adroit and the cunning. The very nature of undue influence makes it impossible for the law to lay down tests to determine its existence with mathematical certainty.

*In re Will of Andrews*, 299 N.C. at 54-55, 261 S.E.2d at 200 (citation omitted); *see also Hardee v. Hardee*, 309 N.C. 753, 756, 309 S.E.2d 243, 245 (1983) ("This Court has recognized the difficulty a party faces in proving undue influence in the execution of a document." (citation omitted)). Nevertheless, we have identified several factors that often support a finding of undue influence ("*Andrews* factors"):

"1. Old age and physical and mental weakness;

2. That the person signing the paper is in the home of the beneficiary and subject to his constant association and supervision;

3. That others have little or no opportunity to see him;

4. That the will is different from and revokes a prior will;

5. That it is made in favor of one with whom there are no ties of blood;

6. That it disinherits the natural objects of his bounty;

7. That the beneficiary has procured its execution."

*In re Will of Andrews*, 299 N.C. at 55, 261 S.E.2d at 200 (quoting *In re Will of Mueller*, 170 N.C. 69, 71, 170 N.C. 28, 30, 86 S.E. 719, 720 (1915)).

The diverse circumstances of *Mueller* and *Andrews* illustrate the need to apply and weigh each factor in light of the differing factual setting of each case. In *Mueller*, the testator's children contested a will executed a week before the testator's death, which left his estate to his caregivers of two weeks, his sister-in-law and her husband. In *Andrews*, the testator's son challenged a will which more favorably treated the testator's second wife and her son by a previous marriage.

In each instance, the facts were sufficient to present the question of undue influence to the jury and to support the jury's verdict setting aside the will.

A caveator need not demonstrate every factor named in *Andrews* to prove undue influence, *In re Estate of Forrest*, 66 N.C. App. 222, 225, 311 S.E.2d 341, 343, *aff'd per curiam*, 311 N.C. 298, 316 S.E.2d 55 (1984), as "[u]ndue influence is generally proved by a number of facts, each one of which standing alone may be of little weight, but taken collectively may satisfy a rational mind of its existence," *Hardee*, 309 N.C. at 757, 309 S.E.2d at 246 (citation and quotation marks omitted).

Accordingly, any evidence showing "an opportunity and disposition to exert undue influence, the degree of susceptibility of [the] testator to undue influence, and a result which indicates that undue influence has been exerted" is generally relevant and important. *In re Will of Thompson*, 248 N.C. 588, 593, 104 S.E.2d 280, 285 (1958) (citation and internal quotation marks omitted). If a reasonable mind could infer from such evidence that the purported last will and testament is not the product of the testator's "free and unconstrained act," but is rather the result of "overpowering influence . . . sufficient to overcome [the] testator's free will and agency," then "the case must be submitted to the jury for its decision." *In re Will of Andrews*, 299 N.C. at 56, 261 S.E.2d at 200.

Here, the record contains a substantial amount of evidence presented by both parties, much of which ultimately conflicts on the question of undue influence as considered through application of the *Andrews* factors. Indeed, the factual situation presented here is more difficult in no small part because the party accused of exerting undue influence over Mr. Jones is his wife of forty-seven years, the natural object of his bounty and an individual who undoubtedly influenced Mr. Jones and his decisions.

We have recognized the particular closeness of the marital relationship on a number of occasions in the context of will cases. *See, e.g., In re Peterson*, 136 N.C. 10, 20, 136 N.C. 13, 27, 48 S.E. 561, 566 (1904) ("In the light of the experience and observation of men of the best judgment and soundest minds, we can see nothing in the fact that this man gave his estate, the produce of their joint industry and economy, to his wife, tending to show mental incapacity or undue influence."); *see also In re Will of Ball*, 225 N.C. 91, 93, 33 S.E.2d 619, 621 (1945) ("Nor is the fact testator gave his property to the childless

**IN RE WILL OF JONES**

[362 N.C. 569 (2008)]

wife of his bosom to the exclusion of his sister and his nephews and nieces evidence of undue influence."); *In re Will of Broach*, 172 N.C. 520, 524, 90 S.E. 681, 683 (1916) ("But the fact that a wife has influence with her husband, and even if there is evidence that she is the dominant partner, this does not of itself prove that she exerted that influence to dictate the terms of the will[.]"); *In re Will of Cooper*, 166 N.C. 210, 211, 81 S.E. 161, 162 (1914) (rejecting as "untenable" the caveator's position that the propounder wife had to rebut a presumption of undue influence).

These cases demonstrate a strong respect for marriage and suggest that spouses are often accorded special consideration in undue influence cases in light of their close relationship with the testator. Nevertheless, the question remains as to whether such influence was "undue" in the context of Mr. Jones's decision to revoke the March Will and execute the September Will. Again, much of the deposition testimony and affidavits is open to competing interpretations. Given our standard of review, however, we view this evidence in the light most favorable to Mr. McLeod and find that he has forecast sufficient facts from which a jury could reasonably infer that Mr. Jones executed the September Will as a result of Mrs. Jones's undue influence.

We reach no conclusion as to the validity of Mr. McLeod's allegations, but find it nonetheless necessary to demonstrate which evidence presented by Mr. McLeod might allow a jury to reasonably infer undue influence, under both the *Andrews* factors and our prior case law defining the term. First, as to Mr. Jones's age, physical, and mental weakness when he signed the September Will: as outlined above, Mr. Jones was seventy-six years old, ill with cancer, and by many accounts confused, in pain, significantly debilitated, and nearly entirely dependent on his wife. In contrast, he was in decent health, ambulatory, and still working at the time the March Will was executed. According to the testimony and affidavits of several individuals who saw Mr. Jones and interacted with him in the months immediately before his death, he appeared vulnerable to undue influence because of his weakened state and in their opinions, Mrs. Jones was engaged in such undue influence.

Mrs. Jones maintains that we should disregard the contents of some of the affidavits submitted by Mr. McLeod, such as that of Mr. Sinclair, as those statements are contradicted by a later affidavit from Mr. Sinclair that she offers. However, these discrepancies, as well as those in the evidence from Dr. Hoffman, go to the weight and credibility of the evidence, which are questions for a jury and not for this

Court. *See, e.g., In re Will of Jarvis*, 334 N.C. 140, 143, 430 S.E.2d 922, 923 (1993) (stating that determining the credibility of testimony is "for the jury, not the court").

We find similarly unpersuasive Mrs. Jones's contention that the trial court's finding that Mr. Jones did not lack testamentary capacity at the time he executed the September Will, undisturbed by the Court of Appeals and not before this Court, should compel the conclusion that Mr. Jones's physical and mental weakness were not so acute as to support the inference that he was more vulnerable to undue influence. We have previously stated that even if a jury resolves the issue of mental capacity against a party seeking to set aside a document, a jury can still find "consistent[] with its answer to the mental capacity issue, that when [the person at issue] executed the [document] he was physically and mentally weak." *Hardee*, 309 N.C. at 758, 309 S.E.2d at 246; *see also Caudill v. Smith*, 117 N.C. App. 64, 69, 450 S.E.2d 8, 12 (1994) ("[A] finding against the [party challenging a document] on the issue of mental capacity does not necessarily preclude a finding of mental weakness on the issue of undue influence." (citing *Hardee*, 309 N.C. at 758, 309 S.E.2d at 246)), *disc. rev. denied*, 339 N.C. 610, 454 S.E.2d 247 (1995).

Turning to the second *Andrews* factor, that the testator is "in the home of the beneficiary and subject to his constant association and supervision," we note again the particular difficulty of weighing such a finding when the testator and the beneficiary are husband and wife residing in the same home, and we caution that this factor should not be allowed to be effectively considered per se prejudicial against a spouse.

The third *Andrews* factor, that "others have little or no opportunity to see" the testator, is likewise self-evident in a situation such as here, in which a wife is looking after a very ill husband. By all accounts, Mrs. Jones was Mr. Jones's primary caregiver in the last months of his life, and evidence of her attention to her husband's needs undoubtedly mitigates the suggestion that she provided such care solely to unduly influence his estate planning decisions. Moreover, the mere fact that the record contains deposition testimony and affidavits from numerous friends and acquaintances who visited Mr. Jones during August and September 2005 undermines the argument that Mrs. Jones was deliberately isolating Mr. Jones.

Nevertheless, Mr. McLeod has forecast evidence that could allow a reasonable jury to infer exactly that conclusion. For example, Mr.

**IN RE WILL OF JONES**

[362 N.C. 569 (2008)]

Jones signed the September Will at the residence where both he and Mrs. Jones lived, while she was present in the house. Although Mr. Jones did occasionally leave the house for brief periods in the late summer months, by the time he executed the September Will, he was completely dependent on others for his physical mobility and care. Mrs. Jones confirmed that Mr. Jones would sometimes spend time at home without his wife, but that she never left him for more than a couple of hours at a time.

More significantly, however, Mr. McLeod presented evidence that an intercom, or baby monitor, was located in Mr. Jones's bedroom, suggesting that Mrs. Jones may have monitored Mr. Jones's personal visits, telephone conversations, or both. In addition, despite his weakened physical condition, the telephone in Mr. Jones's room was located under his bed during the summer of 2005, and Mrs. Jones removed it entirely in September. Mr. Batts recounted twice trying to telephone Mr. Jones on 23 August 2005 to discuss the proposed changes to the March Will; both times, Mrs. Jones answered the calls and barred Mr. Batts from speaking to Mr. Jones.

Although Mr. Batts insisted the call was about a private matter, Mrs. Jones repeatedly inquired as to the purpose of the call and whether Mr. Batts was going to draft a new will. According to Mr. Batts, Mrs. Jones implied that Mr. Batts wanted to challenge the will, and she stated that she had not coerced Mr. Jones into changing his will and had only talked with him about it once. After not hearing back from Mr. Jones, Mr. Batts called him back on 25 August 2005; Mrs. Jones again screened the call and refused to allow Mr. Batts to speak with her husband. James V. Narron, the attorney who drafted the September Will, also recalled that Mrs. Jones told him in a telephone conversation that she wanted Mr. Jones to leave her everything outright and did not want anyone from Carolina Packers to know that Mr. Narron was coming to their home.

Again, while a jury might ultimately find Mrs. Jones's restrictions to be consistent with the actions of a dutiful wife concerned about her sick husband's well-being, Mr. McLeod has forecast evidence that could likewise lead a reasonable jury to weigh this evidence in favor of the conclusion that Mrs. Jones used her control over access to insert herself between Mr. Jones and his attorney, particularly concerning the terms of his will. Regardless of which interpretation hews most closely to the truth, the evidence reflects that a genuine issue of material fact remains.

The fourth *Andrews* factor, that "the will is different from and revokes a prior will," is unquestionably present here as to the March Will and the September Will. Moreover, Mr. McLeod offered considerable evidence that the September Will differed significantly from Mr. Jones's longtime estate plans, while the March Will was largely consistent with prior testamentary instruments executed by Mr. Jones in 1992, 2001, 2003, and 2004. In each of those documents, Mr. Jones devised the bulk of his estate to a trust that would pay income to Mrs. Jones for life but did not pass Carolina Packers shares to her outright. Rather, the 1992 will ultimately directed his shares to a nonprofit foundation bearing his name; the subsequent documents directed the shares to certain named employees, as did the March Will. Although Mr. Jones periodically changed the employees designated to receive the shares, he always included the three employees named in the March Will among the beneficiaries. Mr. Jones also always either named himself or Carolina Packers' certified public accountant (CPA) as trustee and his acting CPA as executor. By contrast, the September Will left everything to Mrs. Jones, including all stock in Carolina Packers, and named her executrix.

Although the fifth and sixth *Andrews* factors—that "the will is in favor of one with whom there are no ties of blood" and that "it disinherits natural objects of [the testator's] bounty"—obviously weigh in Mrs. Jones's favor as the testator's wife and only natural heir, the unique factual situation presented here lessens the importance of these factors. For example, under either the March Will or the September Will, Mrs. Jones received the bulk of Mr. Jones's estate; the principal differences were the degree of control accorded to her as executrix of the September Will, and its provisions as to ownership of the cattle and Carolina Packers. In the latter case, the change ran contrary to Mr. Jones's long-expressed desires, as evidenced in his conversation with Mr. Batts when he executed the March Will and in the earlier testamentary instruments.

Finally, as to the seventh *Andrews* factor, that "the beneficiary has procured [the will's] execution," Mr. McLeod's forecast of evidence is replete with specific facts that could allow a reasonable jury to infer such a conclusion. For example, after learning of the existence and terms of the March Will at some point in July 2005, Mrs. Jones told Mr. McLeod that, "she was very upset about the provisions of the March Will, that she had put up with [Mr. Jones] for almost fifty years and that there was no way that she was going to let that Will remain as it was." The record contains no evidence that Mr. Jones

## IN RE WILL OF JONES

[362 N.C. 569 (2008)]

desired or attempted to change the March Will before that conversation. However, on 1 August 2005, while Mr. Jones was still in the hospital, Mrs. Jones called Mr. Batts and told him that "*she* wanted to see him about Mr. Jones' Will and power of attorney."

In his affidavit, notes, and a file memorandum regarding his subsequent meeting with the Joneses on 5 August 2005, Mr. Batts recollected the following observations: (1) Mrs. Jones led the group's conversation and repeatedly stated that the will needed to be changed so that "she got everything"; (2) "Due to [Mr. Batts's] years of experience, [he] had red flags and warning bells going off in [his] head," and as a result, asked to speak with Mr. Jones alone, to which Mrs. Jones responded, " '[W]hy, he'll just tell you the same thing' "; (3) After Mrs. Jones left the room, Mr. Jones began the conversation by stating that Mr. Batts "should just do the Will the way that [Mrs. Jones] wanted it"; (4) After Mr. Batts informed Mr. Jones that his job as an attorney was to draft a testamentary plan that reflected Mr. Jones's desires, Mr. Jones replied that "he didn't really care anymore, that it wouldn't be his problem who got what because he would be gone"; (5) Mr. Jones further stated that "he would hate to see the company sold because it had been in either his or his father's name for about fifty years," but he "guess[ed]" it "would be okay to leave [it] up to [Mrs. Jones] and the board of directors"; (6) Mr. Jones emphasized that all he wanted to focus on was getting back on his feet "and that he didn't want to keep talking about his Will all the time."

According to Mr. Batts, when he and Mr. Jones rejoined Mrs. Jones, she repeatedly inquired as to what they had discussed. When Mr. Batts responded that it was better if the information remained private due to a potential will contest, Mrs. Jones continued to press the matter. At this point, Mr. Jones became irritated and stated, " '[I]t's the same thing as we talked about before, I didn't tell him anything different.' " Mr. Batts recalled that Mrs. Jones followed him outside after the meeting and without Mr. Jones present, spent several minutes emphasizing again that all Mr. Jones needed was a simple will leaving everything to her and naming her executrix. When Mr. Batts informed her that Mr. Jones had told the named employees about the March Will, she responded that "if they did contest the Will she would just fire them." She further stated that she had been " 'stepped on for too long and was now going to fight for what was hers' " and "her lawyers had told her that [Mr. Jones'] Will wouldn't have worked anyway, because she would have been able to contest it and get one-half of the company."

In addition, Mrs. Jones told Mr. Fowler, Mr. Sinclair, and Mr. Narron of her desire to get the March Will changed. In mid-August Mrs. Jones told Mr. Fowler she knew the March Will left Carolina Packers to three employees and that she was concerned that, if the terms of the Will were effected, she would be voted off the company's board of directors. Mrs. Jones also informed Mr. Fowler for the first time that Mr. Jones had left him certain cattle in the March Will and said that "they wanted [Mr. Fowler] to sign a contract providing [Mrs.] Jones would own half of the calf crop and rights thereto." Mr. Fowler recalled that during the meeting, Mr. Jones "appeared weak, sick, and defeated" and stated, while "[l]ooking down at the floor," "Just sign the contract like she wants."

Around the end of August, Mrs. Jones told Mr. Sinclair the March Will was " 'totally wrong,' " that it did not provide enough support for her, and that she was going to have someone "look into" a new will. In a telephone conversation with Mr. Narron on 29 August 2005, Mrs. Jones stated that she wanted Mr. Jones to leave her everything outright.

All of these incidents and conversations, when viewed in the light most favorable to Mr. McLeod, could support a reasonable jury's inference of undue influence.

In light of our standard of review, we do not recite all of Mrs. Jones's evidence supporting her contention that Mr. Jones's wishes were reflected in the September Will. Suffice it to say, however, that the full evidence under each of the *Andrews* factors, as well as the entire "combination of facts, circumstances and inferences," *In re Will of Andrews*, 299 N.C. at 56, 261 S.E.2d at 200, leaves an issue of undue influence in the execution of the September Will. Perhaps, as asserted by Mrs. Jones, Mr. Jones had a change of heart as to the distribution of his business assets based on his love for her and the care she provided for him at the end of his life. Nevertheless, those questions and ambiguities are precisely the reason why summary judgment was inappropriate here, as the evidence, when taken in the light most favorable to Mr. McLeod, shows that a genuine issue of material fact remains as to whether Mrs. Jones's influence was "undue."

We conclude that Mr. McLeod has sufficiently forecast a prima facie case of undue influence and likewise presents genuine issues of material fact related to the questions of undue influence and *devisavit vel non* in relation to the September Will. Therefore, we reverse and remand to the Court of Appeals for further remand to

the trial court for proceedings not inconsistent with this opinion on the issues of undue influence and *devisavit vel non*.

REVERSED AND REMANDED.