IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-294

No. COA20-655

Filed 6 July 2021

Wake County, No. 17-CVS-15355

WILLIAM D. ANTON, Plaintiff,

v.

THOMAS C. ANTON, JR., individually, in his capacity as current trustee of the Rosemary Anton Revocable Living Trust, and in his capacity as personal representative of the Estate of Rosemary Anton, YVONNE A. NIEMANN, and THE ROSEMARY ANTON REVOCABLE LIVING TRUST, Defendants.

Appeal by Plaintiff from order entered 10 January 2019 by Judge Allen Baddour in Wake County Superior Court. Heard in the Court of Appeals 28 April 2021.

> *Hopler, Wilms, & Hanna, PLLC, by Adam J. Hopler, and Fiduciary Litigation Group, by Thomas R. Sparks, for Plaintiff-Appellant.*

> *Manning Fulton & Skinner P.A., by Robert S. Shields, Jr., for Defendants-Appellees.*

COLLINS, Judge.

¶ 1 Plaintiff appeals the trial court's grant of partial summary judgment in favor of Defendants on Plaintiff's claims of constructive fraud, tortious interference with inheritance, punitive damages, and undue influence. Because Plaintiff has failed to adequately brief his claims of constructive fraud, tortious interference with

inheritance, and punitive damages before this Court, those issues are deemed abandoned. Because the record demonstrates a lack of a genuine issue of material fact concerning two essential elements of an undue influence claim, the trial court did not err in granting Defendants' motion for partial summary judgment on the undue influence claim.

## I. Procedural History

On 27 September 2017, Plaintiff filed a caveat to the purported 6 November 2014 Will of Rosemary Anton ("Revised Will"). An assistant clerk of superior court ordered the matter transferred to superior court on 10 October 2017. The propounders of the Revised Will, Thomas C. Anton, Jr. and Yvonne A. Niemann (together, "Defendants") initially answered on 24 October 2017. Plaintiff subsequently filed a petition for declaratory judgment on 15 December 2017 seeking a judgment that the 6 November 2014 restatement of the Rosemary Anton Revocable Trust ("Restated Trust") was invalid, and that the original trust was still operative. Plaintiff alleged that decedent, Rosemary Anton, lacked the requisite capacity and intent to amend the trust, and the revision was executed under duress and undue influence by Defendants. The trial court ordered the consolidation of the caveat and declaratory judgment actions in July 2018.

Plaintiff thereafter filed an "Amended Complaint and Petition and Request for Declaratory Judgment" alleging that the Restated Trust was invalid and asserting

against Defendants claims for constructive fraud, tortious interference with expectation of inheritance, and punitive damages. Plaintiff alleged that the Restated Trust was improperly executed and was the result of duress or undue influence by Defendants; the Revised Will and Restated Trust were procured by Defendants' use of their position of trust and confidence with Rosemary; and Defendants intentionally manipulated Rosemary to deprive him of his inheritance under the Restated Trust and Revised Will. Defendants answered and asserted counterclaims against Plaintiff for constructive fraud and breach of fiduciary duty, alleging that Plaintiff had misappropriated funds from Rosemary and made self-serving gifts from Rosemary's assets.

¶ 4        Defendants moved for partial summary judgment as to all Plaintiff's claims and Plaintiff filed a memorandum in opposition. Following a hearing, the trial court granted Defendants' motion for partial summary judgment. By written order, the trial court dismissed all of Plaintiffs' claims, leaving only Defendants' counterclaims pending. Plaintiff sought to immediately appeal the trial court's order to this Court. Because the trial court's order was interlocutory and Plaintiff failed to demonstrate a right to immediate review, this Court dismissed Plaintiff's appeal in January 2020. *See Anton v. Anton*, No. COA19-549, 2020 WL 292175, 2020 N.C. App. LEXIS 81 (N.C. Ct. App. 2020) (unpublished). This Court's judgment was filed with the trial court on 28 February 2020.

On 21 May 2020, Defendants dismissed their counterclaims without prejudice. Because no further claims between the parties remained pending in the trial court, the trial court's order granting partial summary judgment became a final judgment as to Plaintiff's claims. *Cf. Parmley v. Barrow*, 253 N.C. App. 741, 745, 801 S.E.2d 386, 389 (2017) ("When a trial court grants partial summary judgment in favor of a defendant, and the plaintiff thereafter voluntarily dismisses its remaining claims, the trial court's order serves as a final judgment."). Following the voluntary dismissal, Plaintiff timely appealed the order granting partial summary judgment to this Court.

## II. Factual Background

Rosemary Anton was married to Thomas C. Anton, Sr., and had three children, William, Thomas, and Yvonne. After Thomas C. Anton, Sr., passed away, Rosemary executed a will ("1993 Will") and a revocable living trust ("1993 Trust").

The 1993 Will provided that Rosemary's personal belongings would be divided evenly between her three children and the remaining property would be distributed to the 1993 Trust. Under the 1993 Trust, the property was to be divided evenly between the children, except that the amount distributed to Plaintiff was to be reduced by a $63,000 debt he owed Rosemary.

In June 2002, Plaintiff moved to Alton, Illinois, to live with Rosemary. In February 2003, Plaintiff purchased and moved into the house next door to Rosemary's. Plaintiff helped Rosemary by doing yardwork and chores around her

house, making necessary repairs to her home, and working in her garden. Rosemary was independent and managed her monthly income and finances with no help from Plaintiff. Defendants helped Rosemary manage her brokerage accounts.

¶ 9 After Rosemary stopped driving in 2009, Plaintiff drove her to medical appointments and social engagements. Rosemary's eyesight was limited. In early 2010, because of Rosemary's aging and decreased mobility, Rosemary, Plaintiff, and Defendants discussed modifying her home to make it more suitable. Rosemary desired to stay in her own home, where she had lived for approximately 40 years. Plaintiff made modifications to his home to provide greater accessibility and safety for Rosemary if she were to live there in the future.

¶ 10 In fall of 2012, Rosemary broke her hip, which required surgery. While she was in the hospital after the surgery, Rosemary executed powers of attorney on 9 October 2012 enabling Plaintiff to make medical and financial decisions on her behalf. After Rosemary signed these powers of attorney, Plaintiff and Defendants decided in a telephone conversation that Defendants would continue to manage Rosemary's brokerage accounts.

¶ 11 After the surgery, Rosemary moved into Plaintiff's modified home next to her house, and Plaintiff stayed in Rosemary's house. Plaintiff brought her meals daily. Rosemary told a longtime friend who visited her during the summer and fall of 2012 that Plaintiff did not allow Rosemary to make decisions, locked her in the house at

night, and left her alone. Rosemary's friend believed that Plaintiff was psychologically hurting Rosemary and that Rosemary was "distraught that her son, William, could treat her the way he did."

¶ 12 In April 2013, Rosemary resigned as trustee of the 1993 Trust and appointed Thomas as the successor trustee. Thomas accepted the appointment in writing.

¶ 13 In summer and fall of 2013, Rosemary complained to Defendants that Plaintiff was limiting her access to clothing and other belongings, giving her no choice as to what she was eating, isolating her, restricting her movement, and locking the doors of the home from 5:00pm until the next morning. When Rosemary shared similar feelings with her friend again in September 2013, the friend contacted Yvonne to let her know. Yvonne believed that Plaintiff was abusing Rosemary. Around October 2013, Yvonne and Thomas decided that they needed to remove Rosemary from Alton.

¶ 14 At Rosemary's request, Yvonne arranged for Rosemary to meet with two Illinois attorneys. Defendants travelled to Illinois, planning to take Rosemary to Wake Forest, North Carolina, where Thomas lived. Thomas told Plaintiff that he was taking Rosemary to lunch and then to visit the grave of her late husband, which he did, but afterward he took Rosemary to meet with the attorneys. During her meeting with the attorneys, Rosemary revoked the previously executed powers of attorney and executed new financial and healthcare powers of attorney in favor of Thomas. Neither Thomas nor Yvonne participated in this meeting. The attorneys documented

that they had "discussed in detail [Rosemary's] option" of executing new powers of attorney, and that Rosemary's execution of the new powers of attorney was a "free and voluntary act." After the meeting, Thomas returned to North Carolina with Rosemary.

¶ 15    Once in North Carolina, Rosemary experienced continued hip pain. On 29 October 2013, Rosemary established a relationship with a primary care doctor in North Carolina. The doctor noted no evidence of cognitive impairment at the time. As of 7 January 2014, Rosemary's medical records reflected diagnoses including hypertension, osteoporosis, allergies, hip pain, macular degeneration, depression, anxiety, and arthritis.

¶ 16    In January 2014, Rosemary fell and hit her hip. On 27 January 2014, she underwent a hip replacement surgery. Rosemary was transferred to inpatient rehabilitation on 30 January 2014. Medical notes reflect that on 30 and 31 January 2014, Rosemary was "cooperative but confused," was "impaired by pain, balance, endurance, strength, cognitive and ROM [sic] deficits," but was "able to follow one step instructions." Medical notes from February indicated instances of confusion and decreased cognition. Rosemary was discharged home from rehabilitation on 28 February 2014. Rosemary's occupational therapist noted that, at Rosemary's discontinuation of occupational therapy in March 2014, she was alert and not confused, though forgetful.

¶ 17   In the spring and summer of 2014, Rosemary met with an attorney in North Carolina to discuss revising the 1993 Will and 1993 Trust. Thomas called the attorney at Rosemary's request. Though the meetings took place at Thomas' home, the attorney met with Rosemary outside of Thomas' presence. Rosemary explained to the attorney that she did not wish to include Plaintiff in her revised estate planning documents and that she did not feel obligated to include Plaintiff because Plaintiff had not been a dutiful son. The attorney described Rosemary as "completely clear about her financial affairs," "mentally alert, extremely sharp in her expressions and conversation," knowing "exactly what she wanted," and "prepared to discuss these matters in detail." The attorney prepared revised estate planning documents but Rosemary did not execute the documents at that time.

¶ 18   Rosemary went to Kentucky to stay with Yvonne in June 2014. Once there, Rosemary met with a Kentucky attorney to discuss executing the revised estate planning documents that had been prepared in North Carolina. In a private meeting at the attorney's office, Rosemary provided the attorney with a "detailed history . . . regarding her relationships with each of her children." Rosemary explained "in great detail that she was not providing for [Plaintiff] in her will . . . because he had not been a dutiful son." The attorney described Rosemary as "a well-educated person" who was "extremely lucid and articulate." On 6 November 2014, Rosemary executed the Revised Will and Restated Trust, along with a new health care power of attorney.

¶ 19     In the Revised Will, Rosemary stated, "I have already provided for my son William D. Anton and intentionally make no provisions for him in this Will." Under the Revised Will, all of Rosemary's property would be left to her Restated Trust. Upon Rosemary's death, only Thomas and Yvonne or their issue were to be the beneficiaries of the Restated Trust. The Restated Trust, like the Will, stated that Rosemary "has already provided for William D. Anton and does not include him as a beneficiary hereunder."

¶ 20     Several people observed Rosemary's condition around the time she executed her revised estate planning documents in November 2014. Susan O'Daniel, a retired school employee, testified that she "visited Rosemary Anton with regularity" between 24 June 2014 and 5 January 2015 while Rosemary was living with Yvonne. Susan testified that the two engaged in a variety of activities and that

> [d]espite her age . . . [Rosemary] always seemed to be mentally alert and clearly aware of all aspects of her life. I never observed or experienced any issues of memory problems, confusion, or lack of concentration . . . . Despite experiencing anticipated health issues she was feisty and forever optimistic, thinking she could do anything she wished. She was physically limited and chronologically aged but incredibly witty and mentally sharp. . . . Rosemary Anton was articulate, well-spoken, and a delightful, well-informed woman. She was a proud woman, with good reason, and very conversive."

¶ 21     Mari Wertz attended the same church as Yvonne and testified that, from September to November 2014, she interacted with Rosemary on approximately 15

occasions. Rosemary discussed a variety of topics with Wertz. Wertz described Rosemary as "a very strong-willed and independent lady" and testified that "she always seemed to be mentally alert and extremely sharp" without "issues of memory problems, confusion or lack of concentration . . . ."

¶ 22 Anne Villanova also attended the same church as Yvonne and testified that she interacted with Rosemary on numerous occasions at mass and other church functions beginning in September 2014. Villanova likewise described Rosemary as "articulate, well-spoken," and "mentally alert and extremely sharp."

¶ 23 After executing the Revised Will and Restated Trust, Rosemary alternated between staying with Yvonne in Kentucky and Thomas in North Carolina. During this period, Rosemary experienced ongoing health problems. On 14 January 2015, Rosemary went to her primary care doctor in North Carolina to be examined for cough, nasal and head congestion, and hematuria. At that visit, her doctor noted evidence of cognitive impairment. On 17 April 2015, Rosemary was weak and could not follow commands well. Rosemary went to the emergency room after fainting, and was treated for an infection and anemia. Rosemary returned home on 19 April 2015.

¶ 24 Rosemary died in March 2017 at 101 years old.

### III. Discussion

**A. Standard of Review**

¶ 25 Plaintiff argues that the trial court erred by granting Defendants' motion for

partial summary judgment. We review a trial court's order granting or denying summary judgment de novo. *In re Will of Jones*, 362 N.C. 569, 573, 669 S.E.2d 572, 576 (2008). Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2019). "When considering a motion for summary judgment, the trial judge must view the presented evidence in a light most favorable to the nonmoving party." *In re Will of Jones*, 362 N.C. at 573, 669 S.E.2d at 576 (citation and quotation marks omitted).

"Summary judgment involves a two-step process: first, the party moving for summary judgment bears the burden of establishing that there is no triable issue of material fact . . . ." *New Hanover Cnty. Bd. of Educ. v. Stein*, 374 N.C. 102, 115, 840 S.E.2d 194, 204 (2020) (brackets, quotation marks, and citations omitted). This "may be accomplished by proving an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense, or by showing through discovery that the opposing party cannot produce evidence to support an essential element of her claim." *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000) (citations omitted). If the movant meets this burden, then "the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating that the nonmoving party will be able to make out at least a prima facie case at trial."

*New Hanover Cnty. Bd. of Educ.*, 374 N.C. at 115, 840 S.E.2d at 204 (brackets, quotation marks, and citations omitted).

## B. Constructive Fraud, Tortious Interference with Inheritance, and Punitive Damages

Plaintiff asserts that the trial court erred by granting partial summary judgment in Defendants' favor on Plaintiff's claims for constructive fraud, tortious interference with inheritance, and punitive damages.

Plaintiff contends that Defendants abandoned their motion for partial summary judgment in the trial court as to these claims because they "neither presented evidence nor argued these issues." Contrary to Plaintiff's assertion, Defendants supported their motion for partial summary judgment with multiple affidavits, deposition excerpts, and other documents. The trial court was permitted to enter summary judgment based upon these materials and the other materials in the record, regardless of whether Defendants made specific legal arguments concerning these claims in memoranda or at the summary judgment hearing. *See* N.C. Gen. Stat. § 1A-1, Rule 56(c) (summary judgment may be entered upon "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any . . . ."). In its order granting Defendants' motion for partial summary judgment, the trial court stated, "having reviewed the pleadings, affidavits, memorandums of law and other matters of record . . . there is no genuine issue of

material fact and the Defendants are entitled to judgment as a matter of law on their Motion for Partial Summary Judgment[.]"

¶ 29 As the party appealing the entry of summary judgment, Plaintiff was obligated to brief the issue of whether the trial court erroneously granted Defendants summary judgment on the claims of constructive fraud, tortious interference with inheritance, and punitive damages before this Court. *See* N.C. R. App. P. 28(b)(6) ("Issues not presented in a party's brief, or in support of which no reason or argument is stated, will be taken as abandoned."). Plaintiff has failed to cite any legal authority or advance any legal arguments as to this issue, and may not rest on the fact that the amended complaint raised the claims. *See Forbis v. Neal*, 361 N.C. 519, 526, 649 S.E.2d 382, 387 (2007) ("Although the original complaint alleged various causes of action including fraud, undue influence, and breach of fiduciary duty, plaintiffs did not brief the undue influence and breach of fiduciary duty claims before this Court and thereby abandoned them."). Accordingly, the issue of whether the trial court erroneously granted summary judgment on Plaintiff's claims of constructive fraud, tortious interference with inheritance, and punitive damages is deemed abandoned.

## C. Undue Influence

¶ 30 Plaintiff also argues that the trial court erred by granting partial summary judgment in Defendants' favor on his claim of undue influence.

¶ 31 "There are four general elements of undue influence: (1) a person who is subject

to influence; (2) an opportunity to exert influence; (3) a disposition to exert influence; and (4) a result indicating undue influence." *In re Will of McNeil*, 230 N.C. App. 241, 245, 749 S.E.2d 499, 503 (2013) (quoting *In re Sechrest*, 140 N.C. App. 464, 469, 537 S.E.2d 511, 515 (2000)). Undue influence requires more than mere influence or persuasion. *In re Will of Jones*, 362 N.C. at 574, 669 S.E.2d at 577. Our Supreme Court

> has previously defined "undue influence" as something operating upon the mind of the person whose act is called in judgment, of sufficient controlling effect to destroy free agency and to render the instrument, brought in question, not properly an expression of the wishes of the maker, but rather the expression of the will of another. "It is the substitution of the mind of the person exercising the influence for the mind of the testator, causing him to make a will which he otherwise would not have made."
>
> In short, undue influence, which justifies the setting aside of a will, is a fraudulent influence, or such an overpowering influence as amounts to a legal wrong. It is close akin to coercion produced by importunity, or by a silent, resistless power, exercised by the strong over the weak, which could not be resisted, so that the end reached is tantamount to the effect produced by the use of fear or force.

*Id.* (quoting *In re Will of Turnage,* 208 N.C. 130, 131-32, 179 S.E. 332, 333 (1935)).

¶ 32    While "[t]he very nature of undue influence makes it impossible for the law to lay down tests to determine its existence with mathematical certainty[,]" *In re Will of Andrews*, 299 N.C. 52, 54-55, 261 S.E.2d 198, 200 (1980) (citation omitted), the North Carolina Supreme Court has identified seven factors probative of the issue of

undue influence:

> 1. Old age and physical and mental weakness.
>
> 2. That the person signing the paper is in the home of the beneficiary and subject to his constant association and supervision.
>
> 3. That others have little or no opportunity to see him.
>
> 4. That the will is different from and revokes a prior will.
>
> 5. That it is made in favor of one with whom there are no ties of blood.
>
> 6. That it disinherits the natural objects of his bounty.
>
> 7. That the beneficiary has procured its execution.

*Id.* at 55, 261 S.E.2d at 200 (quoting *In re Will of Mueller*, 170 N.C. 28, 30, 86 S.E. 719, 720 (1915)). A caveator need not prove each of these factors to prevail. *In re Will of Jones*, 362 N.C. at 576, 669 S.E.2d at 578. But "no matter how difficult the task may be, the burden of proving undue influence is on the caveator and he must present sufficient evidence to make out a [p]rima facie case in order to take the case to the jury." *In re Will of Andrews*, 299 N.C. at 55, 261 S.E.2d at 200.

¶ 33        "When a fiduciary relationship exists between a propounder and testator, a presumption of undue influence arises and the propounder must rebut that presumption." *Seagraves v. Seagraves*, 206 N.C. App. 333, 342, 698 S.E.2d 155, 163 (2010) (quoting *In re Est. of Ferguson,* 135 N.C. App. 102, 105, 518 S.E.2d 796, 799 (1999)). At the time Rosemary executed the Revised Will and Restated Trust, Thomas was both the trustee of the 1993 Trust and Rosemary's agent under Rosemary's 2013

financial and healthcare powers of attorney. Accordingly, Thomas and Rosemary had a fiduciary relationship. *See King v. Bryant*, 369 N.C. 451, 464, 795 S.E.2d 340, 349 (2017) ("A number of relationships have been held to be inherently fiduciary, including the relationships between . . . trustee and beneficiary . . . ."); *Albert v. Cowart*, 219 N.C. App. 546, 554, 727 S.E.2d 564, 570 (2012) ("The relationship created by a power of attorney between the principal and the attorney-in-fact is fiduciary in nature . . . .").

¶ 34    We conclude, however, that Defendants' forecast of evidence in support of their motion for partial summary judgment was sufficient to both rebut the presumption of undue influence and meet their "burden of establishing that there is no triable issue of material fact" concerning the claim for undue influence. *See New Hanover Cnty. Bd. of Educ.*, 374 N.C. at 115, 840 S.E.2d at 204 (citation and quotation marks omitted). Specifically, Defendants have demonstrated that there is no genuine issue of material fact regarding whether Rosemary was "subject to influence" or that the Restated Trust amounted to "a result indicating undue influence." *See In re Will of McNeil*, 230 N.C. App. at 245, 749 S.E.2d at 503 (reciting the essential elements of an undue influence claim).

¶ 35    Defendants presented multiple affidavits indicating that, at the time Rosemary prepared and executed the Revised Will and Restated Trust, she had opportunities to see and associate with others beyond Defendants. *See In re Will of*

*Andrews*, 299 N.C. at 55, 261 S.E.2d at 200 (whether "others have little or no opportunity to see" the testator is probative of undue influence). Defendants' forecast of evidence shows that Rosemary interacted with others regularly, attended church, and participated in church events. *See In re Will of Jones*, 362 N.C. at 579-80, 669 S.E.2d at 579-80 (finding a triable issue of undue influence where, *inter alia*, beneficiary rarely left the cancer-stricken testator alone at home; beneficiary had an "intercom" or "baby monitor" in testator's room while he had visitors; and beneficiary hid, and ultimately removed, the telephone from testator's room).

Defendants also submitted multiple uncontradicted accounts demonstrating Rosemary's mental acuity at the time she executed the Revised Will and Restated Trust. *See In re Will of Andrews*, 299 N.C. at 55, 261 S.E.2d at 200 ("physical and mental weakness" are probative of undue influence). Those who interacted with Rosemary consistently described her as conversive, articulate, sharp, alert, and free of confusion and memory problems, despite her physical ailments and age. The North Carolina attorney who prepared Rosemary's revised estate planning documents described Rosemary as "completely clear about her financial affairs," "mentally alert, extremely sharp in her expressions and conversation," knowing "exactly what she wanted," and "prepared to discuss these matters in detail." Similarly, the Kentucky attorney who assisted Rosemary in executing the documents described Rosemary as "a well-educated person" who was "extremely lucid and articulate" and capable of

providing a detailed history of her relationship with her children and a clear explanation of her choice to disinherit Plaintiff. These accounts of Rosemary's condition are particularly relevant as "[o]ur case law has noted that the mental condition of a testator at the time he or she makes a will or codicil is perhaps, the strongest factor leading to the answer to the fraud and undue influence issue." *In re Will of Campbell*, 155 N.C. App. 441, 457, 573 S.E.2d 550, 562 (2002) (citation, quotation marks, and brackets omitted).

¶ 37        While Defendants facilitated the drafting and execution of the revised estate planning documents by arranging Rosemary's meetings with attorneys and transporting Rosemary, their uncontradicted testimony shows that Defendants undertook these actions at Rosemary's behest. Additionally, Defendants were not themselves present when Rosemary met with her attorneys and executed the documents. *See In re Est. of Forrest*, 66 N.C. App. 222, 229-30, 311 S.E.2d 341, 345 (concluding that the arrangement of the testator's appointments with the drafting attorney did "not rise to the level of 'procurement' of the execution of the will by the beneficiary"), *aff'd per curiam*, 311 N.C. 298, 316 S.E.2d 55 (1984).

¶ 38        Because Defendants met their initial "burden of establishing that there is no triable issue of material fact," the burden shifted to Plaintiff "to produce a forecast of evidence demonstrating that [Plaintiff] will be able to make out at least a prima facie case at trial." *See New Hanover Cnty. Bd. of Educ.*, 374 N.C. at 115, 840 S.E.2d at

204 (citations, quotation marks, and brackets omitted). This he has failed to do. The fundamental thrust of Plaintiff's affidavit and deposition testimony is that the reasons Rosemary provided for disinheriting him were not "factually accurate," leading Plaintiff "to believe that those erroneous rationales were fed to" Rosemary by Defendants. Plaintiff asserts that he was a dutiful son and had a "loving" and "fantastic" relationship with his mother.

¶ 39        "[S]uch conclusory statements of opinion are not evidence properly considered on a motion for summary judgment." *In re Est. of Whitaker*, 144 N.C. App. 295, 302, 547 S.E.2d 853, 858 (2001). Affidavits supporting and opposing summary judgment "shall be made on personal knowledge . . . ." N.C. Gen. Stat. § 1A-1, Rule 56(e). "Our courts have held affirmations based on personal awareness, information and belief, and what the affiant thinks, do not comply with the 'personal knowledge' requirement of Rule 56(e)." *Hylton v. Koontz*, 138 N.C. App. 629, 634, 532 S.E.2d 252, 256 (2000) (citations, quotation marks, and brackets omitted). Plaintiff's bare assertion of a belief that Defendants misled Rosemary is not based on any specific facts within Plaintiff's personal knowledge, and is insufficient to overcome the specific factual evidence forecast by Defendants.

¶ 40        Plaintiff also contends that summary judgment was improper in part because Rosemary was in Defendants' homes, subject to their constant association and supervision, and had little or no opportunity to see others. In support of this

contention, Defendant averred in his affidavit that Defendants "had made it clear to [Plaintiff] that [he] was not welcome" in their homes. But Plaintiff indicated that he was only made to feel unwelcome by "[t]he accusation that [he] would steal from [Rosemary]." Plaintiff did not aver that he ever sought to visit Rosemary in person and was never prohibited from doing so by Defendants. Moreover, Plaintiff did not contradict the evidence presented by Defendants that Rosemary freely saw other people while living with Defendants.

¶ 41    Plaintiff also argues that summary judgment was inappropriate because the Revised Will and Restated Trust were different from the 1993 Will and Trust, and because they disinherited a natural object of Rosemary's bounty. But Rosemary had an absolute right to disinherit anyone of her choosing, including her son, *see In re Will of Campbell*, 155 N.C. App. at 460, 573 S.E.2d at 563, and Defendants provided multiple affidavits explaining Rosemary's consistently-held rationale for doing so. The revised estate planning documents do not otherwise significantly differ from Rosemary's longtime estate plans—they add no new beneficiaries and maintain Defendants as beneficiaries. *See In re Will of Jones*, 362 N.C. at 580, 669 S.E.2d at 580 (finding a triable issue of undue influence where, *inter alia*, the caveator "offered considerable evidence that the [new will] differed significantly from [the testator's] longtime estate plans"). Additionally, the documents were not "made in favor of one with whom there are no ties of blood." *See In re Will of Andrews*, 299 N.C. at 55, 261

S.E.2d at 200.

Plaintiff further contends that evidence of Rosemary's physical and mental weakness precludes summary judgment in Defendants' favor. Plaintiff failed, however, to contradict the evidence that Defendants introduced concerning Rosemary's condition at the time she executed the revised estate planning documents. Plaintiff instead underscores medical records reflecting that Rosemary experienced confusion and cognitive deficits at times before and after Rosemary executed the documents. The records Plaintiff cites from early 2014 were made while Rosemary was rehabilitating from hip replacement surgery. Records from March 2014, when Rosemary discontinued in-home occupational therapy, do not indicate that Rosemary was confused. The medical records provided by Plaintiff do not note any further cognitive concerns until January and March 2015, when Rosemary presented with other acute physical ailments.

Plaintiff argues that portions of Defendants' deposition testimony show that Rosemary was subject to influence. Thomas's testimony reflected his belief that before she left Alton, Rosemary could be coerced, was "under the duress of a very domineering person," and that Plaintiff exercised influence over Rosemary. Yvonne's testimony reflected her belief that Rosemary could be "dependent on a man being in charge" while living with her late husband, and then with Plaintiff. This testimony fails, however, to contradict the accounts submitted by Defendants that Rosemary

had "progress[ed] from weak and timid at the time she arrived from Illinois in 2013" and was independent at the time she executed the revised estate planning documents.

In these circumstances, Plaintiff has failed to raise a genuine issue of whether Rosemary was subject to influence at the time she executed the Restated Trust, and whether it was a result indicating undue influence. *See In re Will of McNeil*, 230 N.C. App. at 245, 749 S.E.2d at 503. Accordingly, Plaintiff has failed to forecast sufficient facts from which a jury could reasonably infer that the Revised Trust was the product of an influence of "sufficient controlling effect to destroy free agency and to render the [Revised Trust], brought in question, not properly an expression of the wishes of [Rosemary], but rather the expression of the will of [Defendants]." *See In re Will of Jones*, 362 N.C. at 574, 669 S.E.2d at 577. The trial court did not err in granting Defendants' motion for partial summary judgment as to Plaintiffs' undue influence claim.

## IV. Conclusion

Plaintiff's challenge to the trial court's grant of partial summary judgment as to his claims of constructive fraud, tortious interference with inheritance, and punitive damages is deemed abandoned. Because Plaintiff did not establish a triable issue on two essential elements of an undue influence claim—whether Rosemary was subject to influence, and whether the Revised Trust was a result indicative of undue influence—the trial court did not err in granting Defendants partial summary

judgment on the undue influence claim.

AFFIRMED.

Judges DIETZ and JACKSON concur.