BOBBY RAY SEAGRAVES, Plaintiff v. DONALD L. SEAGRAVES and wife, CINDY T. SEAGRAVES; HOWARD S. IRVIN, Trustee; and BUILDINGS, INC., a North Carolina Corporation, Defendants

AND

IN THE MATTER OF THE ESTATE OF: PAULINE CORA McELROY SEAGRAVES

No. COA09-302

No. COA09-402

(Filed 17 August 2010)

**1. Appeal and Error— voluntary dismissal—counterclaim pending—dismissal not prejudicial—appeal not interlocutory**

Plaintiff did not abandon his appeal from a partial summary judgment in a wills case where he took a voluntary dismissal of his remaining issues while a counterclaim from defendants was pending. Because of the counterclaim, voluntary dismissal of plaintiff's remaining claim was improper without defendants' consent, which was not given; however, defendants' counterclaim proceeded to trial and there was no prejudice. Also, the appeal was not from an interlocutory order because there were no further issues pending when plaintiff filed the notice of appeal.

**2. Wills— undue influence—fiduciary relationship—non-existent at time of will—in existence when property later transferred**

Summary judgment was not proper on one instance of undue influence in a wills case where the caveators contended that a fiduciary relationship existed that created the rebuttable presumption of undue influence. A fiduciary relationship did not exist between the propounder and his mother when she executed her will, but defendants admitted the existence of such a relationship when a tract of land originally willed to a brother was conveyed to the propounder.

**3. Wills— undue influence—evidence not sufficient**

Considering the factors in *In re Will of Andrews*, 299 N.C. 52, the caveators did not forecast any relevant,. admissible evidence from which a jury could reasonably decide that decedent was acting under the influence of propounder and not under her own free will when she executed her will.

**4. Wills— undue influence—testamentary capacity**

The trial court did not err by granting propounder's motion for summary judgment on the issue of testamentary capacity. The caveators' general testimony about the decedent's deteriorating health and mental confusion was not sufficient to show that she lacked testamentary capacity at the time she executed her will.

**5. Notaries Public— authority of notary public—testimony sufficient**

The trial court did not err by denying the caveators' motions for directed verdict and judgment notwithstanding the verdict in a wills case on the issue of whether the paralegal who notarized the will was a licensed notary public. The testimony established that she was authorized to administer oaths under statute.

**6. Appeal and Error— preservation of issues—failure to appeal**

Plaintiff's failure to appeal from an order denying a motion to continue meant that the issue was not preserved for appellate review.

Appeal by Plaintiff in case 07 CVD 96 from order entered 17 September 2008 by Judge Paul C. Ridgeway in Superior Court, Cabarrus County. Appeal by Caveators in case 06 E 616 from order entered 17 September 2008 by Judge Paul C. Ridgeway and judgment entered 7 January 2009 by Judge Michael E. Beale in Superior Court, Cabarrus County. Heard in the Court of Appeals 17 September 2009. As the issues presented in these appeals involve common questions of law, we have consolidated the appeals pursuant to Rule 40 of the North Carolina Rules of Appellate Procedure. N.C. R. App. P. 40.

*Ferguson, Scarbrough, Hayes, Hawkins & DeMay, P.A., by James R. DeMay, for Plaintiff-Appellant and Caveators-Appellants.*

*Weaver, Bennett & Bland, P.A., by Michael David Bland, for Defendants-Appellees and Propounder-Appellee.*

STEPHENS, Judge.

This matter presents two separate but related actions which have been consolidated on appeal. The first action, *Seagraves v. Seagraves,* 07 CVD 96, arises from the *inter vivos* transfer of certain real property by Pauline Seagraves ("Pauline" or "Decedent"). The second action, *In the Matter of the Estate of: Pauline Cora McElroy Seagraves,* 06 E 616, involves a caveat to Decedent's will.

## I. *Procedural History and Factual Background*

Decedent Pauline Seagraves and her husband, Paul Seagraves ("Paul"), had four sons, Harold Seagraves ("Harold"), Bobby Seagraves ("Bobby" or "Plaintiff"), Paul Wayne Seagraves ("Wayne"), and Donald Seagraves ("Donald" or "Propounder"). In September 2000, Paul and Pauline executed reciprocal wills by which they devised all of their real property first to each other and then to their sons in four equal shares. Paul died on 3 January 2001. Before their deaths, Paul and Pauline resided on Gold Hill Road in Concord, North Carolina, where they owned approximately 81 acres of property. After Paul's death, Pauline lived alone on the Gold Hill Road property until June 2004, when a caretaker was hired to assist her during the day.

On 20 September 2004, Donald drove Pauline to her attorney's office in Charlotte, North Carolina. Pauline met with attorneys H. Edward Knox ("Mr. Knox"), Frances Knox ("Ms. Knox"), and Kara McIvor to execute a new will (the "Will") and to execute a power of attorney in favor of Donald. The execution of the Will was videotaped. Pauline's Will changed the disposition of Pauline's estate from the 2000 will, which divided Pauline's estate equally among her four sons. The new Will devised Pauline's property as follows: 65.5 acres to Donald, 14.1 acres to Bobby, and the 1.6 acre homesite to Harold and Wayne.

In March 2005, Donald hired a surveyor to survey Pauline's property in order to allocate a 3.2 acre tract out of the 14.1 acres devised to Bobby under the Will. Attorney Fletcher Hartsell, Jr. ("Mr. Hartsell") prepared the 3.2 acre deed and testified in an affidavit that Pauline had requested him to prepare the deed so that Donald could have a right-of-way to his residence after her death.

On 16 April 2005, Pauline was hospitalized for, *inter alia*, a urinary tract infection and complaints of an "altered level of awareness, nausea, and vomiting." On the second day of Pauline's hospital stay, her mental status returned to baseline. Pauline's medical records provide that "[t]he etiology of her mental status change was thought to be secondary to acute delirium secondary to her urinary tract infection."

On 25 May 2005, Pauline signed the deed for the 3.2 acre tract, conveying this property to Donald and his wife, Cindy Seagraves ("Cindy"). In June 2005, after the deed to the 3.2 acre tract had been

executed and notarized, Mr. Hartsell met privately with Pauline and again discussed her reasons for the conveyance before he recorded the deed. The deed to the 3.2 acre tract was recorded on 19 July 2005.

Pauline presented to the Ardsley Medical Group in Concord, North Carolina, on 2 June, 14 September, and 14 November 2005 for regular checkups. Pauline's medical records from these visits show minor ailments, but contain no mention of dementia or of any diminished mental capacity. On 30 November 2005, Pauline was seen by Dr. Sylvie Bastajian ("Dr. Bastajian") and was given a physical examination. Dr. Bastajian found that other than "some residual post nasal drip[,]" Pauline was "doing okay." Dr. Bastajian testified in an affidavit that on every occasion she examined Pauline, "she was a pleasant, elderly patient who was in command of her mental faculties."

In November 2005, Donald again commissioned the surveyor to survey an 8.9 acre tract of Pauline's property, which at the time had been allotted to be received by Bobby under the Will. On 30 November 2005, Pauline signed a deed for the 8.9 acre tract and conveyed this property to Donald and Cindy. The 8.9 acre tract adjoined the previously conveyed 3.2 acre tract and the home of Donald and Cindy. In his deposition, Donald testified that he asked Pauline for the additional acreage so that his property could qualify as farmland for tax purposes.

In December 2005, Harold, Bobby, Wayne, and their families learned of the conveyances to Donald and Cindy and of the execution of the Will. This revelation further exacerbated the already strained relationship between Pauline and her children and their spouses. Pauline died on 25 August 2006 at the age of 92.

On 10 January 2007, Bobby filed a complaint[1] in Cabarrus County District Court against Donald and Cindy. On 8 February 2007, Bobby filed an amended complaint which added Howard S. Irvin and Buildings; Inc. (collectively with Donald and Cindy, "Defendants") as Defendants. In the amended complaint, Bobby asserted the following causes of action: (1) the exercise of undue influence over Pauline by Donald and Cindy which resulted in Pauline's transfer to Donald and Cindy of tracts of land earlier devised to Bobby under Pauline's Will; (2) the commission of constructive fraud by Donald and Cindy resulting in the same transfers; (3) an action to set aside a deed of trust

---

1. The record on appeal does not contain the original complaint and contains only the civil summons issued on 10 January 2007.

against the 8.9 acre tract of land held by Howard Irvin for the benefit of Buildings, Inc.; and (4) a constructive trust against the funds loaned by Buildings, Inc. On 28 February 2007, Defendants filed an answer and asserted counterclaims for (1) slander of title, (2) slander, and (3) unfair trade practices. On 22 June 2007, however, Defendants filed a notice of dismissal[2] for the second and third counterclaims, leaving only the counterclaim for slander of title to be decided by the trial court. On 4 October 2007, Bobby moved to transfer the matter from district court to superior court, and this motion was granted on 13 November 2007.

On 19 July 2007, Harold, Wayne, and Bobby (collectively "Caveators") filed a Caveat to the probate of Pauline's Will. The Caveators alleged that Decedent lacked testamentary capacity when she executed the Will, and that the Will was procured through undue influence. That same day, Fred A. Biggers, the Cabarrus County Clerk of Superior Court, entered an order suspending further proceedings in relation to Decedent's estate. The parties were aligned by order entered in superior court on 13 August 2007, which named Harold, Wayne, and Bobby as Caveators, and Donald as Propounder.

On 21 July 2008, Propounder and Defendants filed a joint motion for summary judgment in both cases 07 CVD 96[3] and 06 E 616. A hearing was held on both matters at the 2 September 2008 session of the Cabarrus County Superior Court, the Honorable Paul C. Ridgeway presiding. On 17 September 2008, Judge Ridgeway granted summary judgment in favor of Propounder in 06 E 616. This order determined that there were no genuine issues of material fact regarding the Caveators' allegations of undue influence, duress, and lack of testamentary capacity. Caveators filed notice of appeal from the trial court's order of summary judgment on 26 September 2008. This matter went to trial on the issue of *devisavit vel non*[4] at the 15 September 2008 Civil Session of Cabarrus County Superior Court, the Honorable Michael E. Beale presiding. The jury returned a verdict that the Will was executed according to law and was the Last Will and

2. The pleading contained in the record and entitled "Notice of Stipulation of Dismissal of Second and Third Counterclaims by Defendants" is dated 22 June 2007, but this document is not file stamped.

3. Although case number 07 CVD 96 was properly transferred to superior court, the case caption on the superior court's order for partial summary judgment from which Appellants appeal cites this case as "07 CVD 96."

4. The latin phrase "*devisavit vel non*" refers to a determination of whether a will is valid. *In re Will of Campbell*, 155 N.C. App. 441, 450, 573 S.E.2d 550, 558 (2002).

Testament of Pauline Seagraves. Judge Beale entered judgment upon the jury's verdict on 7 January 2009. Caveators filed notice of appeal from the trial court's judgment on 3 February 2009.

On 17 September 2008, the trial court also granted partial summary judgment for Defendants in 07 CVD 96 on all issues related to the 3.2 acre deed, leaving the issues related to the 8.9 acre deed for the jury to decide. Plaintiff made a motion to continue the trial on the remaining issues involving the 8.9 acre deed in order to immediately appeal from the trial court's order of partial summary judgment. Plaintiff's motion was denied. Plaintiff did not appeal from the trial court's denial of his motion to continue. On 19 September 2008, Plaintiff voluntarily dismissed his remaining claims regarding the 8.9 acre tract. Trial proceeded on Defendants' remaining counterclaim for slander of title. On 28 September 2008, the trial court signed a judgment for directed verdict in favor of Plaintiff on this issue.[5] Plaintiff filed notice of appeal from the trial court's 17 September 2008 order of partial summary judgment on 7 October 2008.[6] Defendants did not appeal from the trial court's entry of directed verdict on their counterclaim.

## II. Discussion

### A. Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law." N.C. Gen. Stat. § 1A-1, Rule 56(c) (2008). "Where a motion for summary judgment is supported by proof which would require a directed verdict in [the movant's] favor at trial he is entitled to summary judgment unless the opposing party comes forward to show a triable issue of material fact." *In re Will of Edgerton*, 29 N.C. App. 60, 63, 223 S.E.2d 524, 526 (1976). Summary judgment should be entered cautiously. *Volkman v. DP Associates*, 48 N.C. App. 155, 157, 268 S.E.2d 265, 267 (1980). However, if the party with the burden of proof

---

5. Although the trial court's judgment entering a directed verdict for Plaintiff is file stamped, the stamp is too faint to read, and thus we cannot determine the actual date the judgment was entered.

6. The record indicates that the trial court also filed a separate order on 11 September 2008 granting summary judgment in favor of Defendant, Buildings, Inc., on all claims against Buildings, Inc. Plaintiff filed notice of appeal from this order on 7 October 2008. This appeal is not before us.

cannot prove the existence of each essential element of its claim or cannot produce evidence to support each essential element, summary judgment is warranted. *Steel Creek Dev. Corp. v. James,* 300 N.C. 631, 638, 268 S.E.2d 205, 210 (1980). "[T]he standard of review on appeal from summary judgment is whether there is any genuine issue of material fact and whether the moving party is entitled to a judgment as a matter of law." *Bruce-Terminix Co. v. Zurich Ins. Co.,* 130 N.C. App. 729, 733, 504 S.E.2d 574, 577 (1998).

## B. *Abandonment of Plaintiff's Appeal*

[1] In 07 CVD 96, Defendants argue that Plaintiff abandoned his right to appeal from the trial court's order granting partial summary judgment when Plaintiff took a voluntary dismissal of the remaining issues. Specifically, Defendants contend that Plaintiff's voluntary dismissal was improper and also that the order granting partial summary judgment was interlocutory, and thus, not immediately appealable. We are not persuaded by Defendants' contentions.

Rule 41 of the North Carolina Rules of Civil Procedure provides that "an action or any claim therein may be dismissed by the plaintiff without order of court . . . by filing a notice of dismissal at any time before the plaintiff rests his case[.]" N.C. Gen. Stat. § 1A-1, Rule 41(a)(1) (2008). However, a plaintiff may not dismiss his action by filing a notice of dismissal if to do so would defeat the rights of a defendant who has theretofore asserted some ground for affirmative relief, even though the plaintiff acts before resting his case. *McCarley v. McCarley,* 24 N.C. App. 373, 376, 210 S.E.2d 531, 533 (1975), *rev'd in part on other grounds,* 289 N.C. 109, 221 S.E.2d 490 (1976) (expressly agreeing with the Court of Appeals' Rule 41 holding). Upon defendant's demand for affirmative relief, defendant's right to have his claim adjudicated in the case "has supervened . . . and plaintiff thereby loses the right to withdraw allegations upon which defendant's claim is based without defendant's consent." *McCarley,* 289 N.C. at 113, 221 S.E.2d at 493 (internal citation and quotation marks omitted). "Where defendant sets up a claim for affirmative relief against plaintiffs arising out of the same transactions alleged by plaintiffs, plaintiffs cannot take a voluntary dismissal under Rule 41 without the consent of defendant." *Maurice v. Hatterasman Motel Corp.,* 38 N.C. App. 588, 592, 248 S.E.2d 430, 433 (1978); *see Swygert v. Swygert,* 46 N.C. App. 173, 177, 264 S.E.2d 902, 904-05 (1980) (Where a counterclaim is filed which arises out of the same transaction alleged in the complaint, plaintiff thereby loses the right to withdraw

allegations upon which defendant's claim is based by taking a voluntary nonsuit without defendant's consent.).

In 07 CVD 96, the trial court granted partial summary judgment for Defendants on Plaintiff's claims regarding the 3.2 acre tract of land. The trial court's order left for further resolution the Plaintiff's claim as to the 8.9 acre tract and Defendants' slander of title counterclaim. Thus, because Defendants' counterclaim remained pending after the entry of partial summary judgment, Plaintiff was not permitted to take a voluntary dismissal of his remaining claim without Defendants' consent. Defendants did not consent to Plaintiff's dismissal in this matter, and thus voluntary dismissal of Plaintiff's remaining claim was improper.

Defendants, however, have failed to demonstrate any prejudice they suffered by the improper dismissal of Plaintiff's remaining claim. After Plaintiff's voluntary dismissal, Defendants' counterclaim proceeded to trial; Defendants presented evidence in support of their counterclaim; and upon Plaintiff's motion, the trial court entered a directed verdict in his favor after determining that the evidence, taken in the light most favorable to Defendants, was insufficient as a matter of law to be submitted to the jury. *See Davis v. Dennis Lilly Co.*, 330 N.C. 314, 322-23, 411 S.E.2d 133, 138 (1991) (setting out the standard of review for directed verdict). Although the trial court ruled in favor of Plaintiff on Defendants' counterclaim, Defendants have not argued that this ruling was a consequence of the improper voluntary dismissal of Plaintiff's claim. Thus, we are disinclined to disturb the trial court's order on this basis where Defendants have shown no injury resulting therefrom.

In addition, Defendants have failed to show that the trial court's order was interlocutory. "An interlocutory order is one made during the pendency of an action, which does not dispose of the case, but leaves it for further action by the trial court in order to settle and determine the entire controversy." *Veazey v. Durham*, 231 N.C. 357, 362, 57 S.E.2d 377, 381 (1950). Interlocutory orders are generally not immediately appealable to this Court. *Hudson-Cole Dev. Corp. v. Beemer*, 132 N.C. App. 341, 344, 511 S.E.2d 309, 311 (1999).

Plaintiff filed a notice of appeal from the trial court's order of partial summary judgment on 7 October 2008. At that time, there were no remaining issues pending before the trial court, and thus there was no further action required by the trial court "in order to settle and deter-

mine the entire controversy." *Veazey*, 231 N.C. at 362, 57 S.E.2d at 381. Accordingly, the trial court's order was not interlocutory when Plaintiff filed notice of appeal. Having determined that Plaintiff's appeal is properly before us, we now address the merits of this appeal.

### C. Undue Influence

**[2]** The Appellants in both matters argue that the trial court erred in granting summary judgment on the issue of undue influence. Because the arguments on the issue of undue influence in both matters are substantially the same, we address these arguments together. Specifically, Caveators and Plaintiff argue that genuine issues of material fact existed as to whether Donald and Cindy Seagraves exercised undue influence over Decedent in order to procure the 3.2 acre tract of land and to coerce her into executing the Will.

"Undue influence is defined as 'a fraudulent influence over the mind and will of another to the extent that the professed action is not freely done but is in truth the act of the one who procures the result.'" *In re Will of Dunn*, 129 N.C. App. 321, 328, 500 S.E.2d 99, 103-04 (quoting *In re Estate of Loftin and Loftin v. Loftin*, 285 N.C. 717, 722, 208 S.E.2d 670, 674-75 (1974)), *disc. review denied*, 348 N.C. 693, 511 S.E.2d 645 (1998).

> Something must operate upon the mind of a person allegedly unduly influenced which has a controlling effect sufficient to destroy the person's free agency and to render the instrument not properly an expression of the person's wishes, but rather the expression of the wishes of another or others. It is the substitution of the mind of the person exercising the influence for the mind of the [person executing the instrument], causing him to make [the instrument] which he otherwise would not have made.

*Hardee v. Hardee,* 309 N.C. 753, 756, 309 S.E.2d 243, 245 (1983).

"There are four general elements of undue influence: (1) a person who is subject to influence; (2) an opportunity to exert influence; (3) a disposition to exert influence; and (4) a result indicating undue influence." *Dunn*, 129 N.C. App. at 328, 500 S.E.2d at 103-04 (internal citation and quotation marks omitted). Our Supreme Court has enumerated the following factors as being probative on the issue of undue influence:

1. Old age and physical and mental weakness.

2. That the person signing the paper is in the home of the beneficiary and subject to his constant association and supervision.

3. That others have little or no opportunity to see him.

4. That the will is different from and revokes a prior will.

5. That it is made in favor of one with whom there are no ties of blood.

6. That it disinherits the natural objects of his bounty.

7. That the beneficiary has procured its execution.

*In re Will of Andrews*, 299 N.C. 52, 55, 261 S.E.2d 198, 200 (1980) (internal citations and quotation marks omitted).

### *i. Presumption of Undue Influence for Fiduciaries*

Plaintiff and Caveators contend that a fiduciary relationship existed between Donald and Pauline and that this created a presumption of undue influence for the execution of the Will and the deed to the 3.2 acre tract. For the following reasons, we do not agree that a fiduciary relationship existed at the time of the execution of the Will. However, in light of Defendants' admission in their answer to Plaintiff's amended complaint and counterclaims, we agree that such a relationship did exist at the time of Pauline's conveyance to Donald of the deed to the 3.2 acre tract.

"When a fiduciary relationship exists between a propounder and testator, a presumption of undue influence arises and the propounder must rebut that presumption." *In re Estate of Ferguson*, 135 N.C. App. 102, 105, 518 S.E.2d 796, 799 (1999). In *Ferguson*, this Court held that no fiduciary relationship existed between the testator and propounder where the testator executed a power of attorney naming the propounder "attorney-in-fact contemporaneously with the execution of her will." *Id.* at 105, 518 S.E.2d at 798. This Court noted that the evidence indicated that the testator delivered the power of attorney to the propounder more than 18 months after the execution of her will and that the evidence did not indicate that the propounder served as the testator's attorney-in-fact at the time the testator executed her will. *Id.* Thus, we held that the trial court in *Ferguson* "did not err by failing to instruct the jury that [the p]ropounder bore the burden of proof regarding the issue of undue influence." *Id.* at 106, 518 S.E.2d at 799.

Our analysis in the present matter is informed by the holding in *Ferguson*. Pauline executed a power of attorney in favor of Donald contemporaneously with the execution of the Will. The evidence indicates that Donald did not learn of the power of attorney until after it was executed. As we held in *Ferguson*, this alone does not establish the existence of a fiduciary relationship. Moreover, the power of attorney was not recorded until 19 July 2006, almost two years after the Will was executed. Finally, there is no evidence that Donald ever served as Pauline's attorney-in-fact. Accordingly, we hold that as a matter of law, a fiduciary relationship did not exist between Donald and Pauline at the time Pauline executed the Will.

With regard to the conveyance of the deed to the 3.2 acre tract, however, Defendants admit in their answer to the amended complaint and counterclaims that

[o]n the date the above described deeds [to the 3.2 and 8.9 acre tracts] were executed and signed, Defendant Donald L. Seagraves held a position of trust and confidence in that he was the Attorney in Fact for the Decedent/Grantor. Upon information and belief, Defendant Donald L. Seagraves had assumed the management of many of her business affairs at or prior to that time.

Thus, by Defendants' admission, a fiduciary relationship existed between Donald and Pauline at the time of the conveyance of the deed to the 3.2 acre tract, creating a rebuttable presumption of undue influence. *See Ferguson*, 135 N.C. App. at 156, 518 S.E.2d at 799. Accordingly, summary judgment was not proper on the issue of the conveyance of the 3.2 acre tract due to the existence of genuine issues of material fact. Therefore, the trial court's order granting partial summary judgment in 07 CVD 96 is reversed.

### ii. Caveat Proceeding

[3] [T]he burden of proving undue influence is on the caveator and he must present sufficient evidence to make out a [p]rima facie case in order to take the case to the jury. The test for determining the sufficiency of the evidence of undue influence is usually stated as follows: [i]t is generally proved by a number of facts, each one of which, standing alone, may have little weight, but taken collectively may satisfy a rational mind of its existence.

*Andrews*, 299 N.C. at 55, 261 S.E.2d at 200 (internal citations omitted). "A caveator need not demonstrate every factor named in *Andrews* to prove undue influence, as [u]ndue influence is generally

SEAGRAVES v. SEAGRAVES

[206 N.C. App. 333 (2010)]

proved by a number of facts, each one of which standing alone may be of little weight, but taken collectively may satisfy a rational mind of its existence." *In re Will of Jones*, 362 N.C. 569, 576, 669 S.E.2d 572, 578 (2008) (internal citation and quotation marks omitted).

With regard to the first factor, "[o]ld age and physical and mental weakness[,]" *Andrews*, 299 N.C. at 55, 261 S.E.2d at 200, Caveators point to the fact that Pauline was born on 29 January 1914, and thus was 90 years old when she executed the Will. Bobby's wife, Linda Seagraves ("Linda"), testified in an affidavit that beginning in 2003, Pauline became very confused and had occasional delusions about being visited by her late husband, Paul. Linda's testimony is unsupported by specific details, and without more, is insufficient to establish that Pauline was a person subject to influence or that Pauline's mental health was weak.

In July 2004, two months before she met with her attorney to execute the Will, Pauline's medical problems included diastolic blood pressure dysfunction, occasional pulmonary congestion, back pain, and footdrop in the past. Her medical records also indicate that she tired easily and was depressed about "not being able to get around." Although these medical problems do not reflect on Pauline's mental capacity, we neverthless conclude that the first *Andrews* factor weighs in favor of Caveators.

As to the second factor, "[t]hat the person signing the paper is in the home of the beneficiary and subject to his constant association and supervision[,]" *id.*, Caveators argue that Donald and Cindy lived approximately 1,500 feet from Pauline. Caveators have not shown, however, that Donald and Cindy resided "in the home" or that Pauline was subject to their "constant association and supervision." *Jones*, 362 N.C. at 575, 669 S.E.2d at 577. Crystal Seagraves ("Crystal"), Bobby's daughter-in-law, testified in an affidavit that "[i]t was my impression that during this period of time, Pauline was like Donnie's child. Everything that Pauline did was very controlled by Donnie. Pauline often appeared to me to be very afraid to talk about her family." Crystal did not specify exactly when "this period of time" occurred, however, and thus her testimony is insufficient to establish that Donald and Cindy subjected Pauline to their constant association and supervision at the time Pauline executed the Will. Caveators' evidence in support of this factor includes only events that occurred months or years *after* the execution of the Will.

Caveators presented no evidence that Donald and Cindy subjected Pauline to their constant supervision prior to or during September 2004. *See In re Will of Sechrest,* 140 N.C. App. 464, 469, 537 S.E.2d 511, 515 (2000) (stating our Court's inquiry as whether, "at the time the testat[rix] executed [her] last will and testament, [her] own wishes and free will had been overcome by another"), *disc. review denied,* 353 N.C. 375, 547 S.E.2d 16 (2001). Although evidence of undue influence at a reasonable time before and after the execution of a will is relevant, *see generally In re Will of Wadsworth,* 30 N.C. App. 593, 595, 227 S.E.2d 632, 633 (1976) ("On the issue of testamentary capacity, it is proper to show the mental condition of the maker at a reasonable time before and after the execution of the purported will."), evidence of Donald and Cindy's conduct after the execution of the contested Will alone is insufficient to satisfy the Caveators' burden, particularly when Caveators' evidence is not specific as to how long after the Will's execution such conduct occurred.

With regard to factor three, "[t]hat others have little or no opportunity to see [Decedent,]" *Andrews,* 299 N.C. at 55, 261 S.E.2d at 200, Caveators contend that Donald and Cindy shielded Pauline from the other members of the family. However, Caveators' individual depositions establish that all family members had free and unrestricted access to Pauline in 2004, 2005, and 2006. In his deposition, Wayne testified that he lived in Apex, North Carolina, and that after his father died in 2001, he visited his mother, "[a]s often as I could when I could get away from my business." Wayne stated that he occasionally stayed with his mother and that he brought his wife and daughter along on these visits. Furthermore, Wayne testified that he "talked to Mom a lot on the phone." Bobby testified that he used to visit his mother "[t]wo or three times a week[,]" and that he often stopped by after work. Bobby stated that Donald never attempted to prevent him from visiting Pauline until "[t]he last 30 days there[,]" but up until that time, Bobby, his wife, "and any of the members of the family came and went as they pleased over there[.]" Additionally, Harold testified that he resided in Colorado Springs, Colorado, but his work brought him to Raleigh several times a year, so he would visit Pauline whenever he was in North Carolina beginning when his father died in 2001 and up until his mother's death in 2006. Also, Harold and his family visited Pauline in the summer of 2005 and spent approximately ten days with her. Harold testified that he was able to communicate effectively with his mother when he saw her and when they spoke over the telephone.

Caveators also offered the testimony of Cabarrus County Sheriff's Deputy, Wade Gray ("Deputy Gray"), in support of this factor. In a deposition, Deputy Gray testified about an incident in which Cindy

> called and complained that all three of [Pauline's] boys had gone up to the house carrying guns and was threatening her and Donnie and that she wanted them off the property. She didn't want them coming around, that they had power of attorney over the property, and they were not welcome to be there.

Although offered in support of this factor, we fail to see how this incident supports Caveators' argument that Donald and Cindy improperly excluded other members of the family from seeing Pauline. In their brief, Caveators describe Cindy's complaint to the sheriff's department as "ridiculous." If Caveators mean to assert that Cindy fabricated the story about their carrying guns to Pauline's home, there is no evidence in the record to support such an assertion. On the other hand, if Caveators did in fact come to Pauline's home "carrying guns" and this was meant as a threatening gesture, Cindy's reaction was reasonable. Moreover, there is absolutely no evidence regarding when this incident occurred. Thus, there is no evidence that Donald and Cindy denied other members of the family access to Pauline, and Caveators' own testimony indicates that they had unfettered access to visit with and speak to Pauline. Accordingly, factor three also weighs against Caveators' contention.

As to factor four, "[t]hat the will is different from and revokes a prior will[,]" *id.*, Propounder and Caveators each acknowledge that in September 2000, Paul and Pauline executed reciprocal wills devising their estates to each other, or to their four sons in shares of equal value if their spouse predeceased them. Although the record does not include a copy of Pauline's 2000 will, because Propounder and Caveators recognize the existence of this will, we conclude that factor four weighs in Caveators' favor.

Factor five, "[t]hat it is made in favor of one with whom there are no ties of blood[,]" *id.*, weighs against Caveators as the Will is in favor of her four natural children, regardless of whether the children's shares are equal. Similarly, factor six, "[t]hat it disinherits the natural objects of [Decedent's] bounty[,]" *id.*, also weighs against Caveators as Pauline's Will divides her property solely among her four children.

Lastly, the seventh factor, "[t]hat the beneficiary has procured [the will's] execution[,]" *id.*, weighs against Caveators' argument as well. All of the evidence from those individuals with personal knowledge of the execution of the Will supports Propounder's contention that he did not procure the Will. Ms. Knox testified by affidavit that Pauline "was very upset and hurt by the manner in which her three older children, Harold, Wayne, and Bobby, treated her and acted as if they had a right to dictate how she disposed of her property[,]" and that Ms. Knox was "absolutely certain that Pauline Seagraves on September 20, 2004, was of sound mind and was not acting under the duress or the influence of any other person." Furthermore, Ms. Knox testified that "[n]one of [Pauline's] children had any input or control over her decision-making process, and none of them were present on any occasion when I discussed these issues with her."

Caveators' remaining evidence that Propounder procured the execution of the Will is inadmissible and irrelevant. Caveators presented the testimony of Deputy Gray to demonstrate that Donald had procured the execution of Pauline's Will. Deputy Gray testified that sometime after Paul's death

[Pauline] came out and said, "Well, Donnie threatened me."

I said, "He threatened you? What did he threaten you with? What's he going to do?"

"Well, he said if I didn't sign some paperwork and change the will and tell people what he tells me to say that he's going to put me in a nursing home. He says, 'I got power of attorney. I can do what I want to.' He said, 'Bobby, Wayne, Harold, can't none of them stop me.' "

Deputy Gray's testimony contains double hearsay,[7] as Deputy Gray not only testified about statements allegedly made by Pauline, but also about statements allegedly made by Donald to Pauline. For Deputy Wade's testimony to be admissible in evidence, both Donald's and Pauline's statements must fall within an exception to the rule prohibiting hearsay. Pauline's statement to Deputy Gray is admissible under the state of mind exception to the hearsay rule. *See* N.C. Gen. Stat. § 8C-1, Rule 803(3) (2008) ("A statement of the declarant's then

---

7. Hearsay is a "statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted" and is inadmissible unless it is subject to a recognized exception. N.C. Gen. Stat. § 8C-1, Rule 801 (2008).

existing state of mind" is not excluded by the hearsay rule.). Donald's statement, however, does not fall within any exception to the hearsay rule and is thus not admissible as evidence that Donald threatened Pauline.

If, however, Donald's statement was admissible as nonhearsay,[8] this evidence is still not probative of the exercise of undue influence at the time of the execution of the Will. Deputy Gray stated that his conversation with Pauline occurred "before she actually got totally wheelchair-bound" and sometime "after Paul died[.]" The evidence indicates that Pauline became completely wheelchair-bound after a fall she suffered approximately seven weeks before her death on 25 August 2006. Prior to that fall, Pauline was still able to get up and use the restroom with a little help.[9] Accordingly, the incident to which Deputy Gray testified could have occurred at any point between 3 January 2001 and July 2006. This broad time frame is insufficient to establish that Pauline felt threatened at the time she executed her Will in September 2004 or that Donald procured the execution of the Will.

Caveators have not forecast any relevant, admissible evidence from which a jury could reasonably decide that when she executed her Will on 20 September 2004, Pauline was not acting of her own free will, but rather was acting under the undue influence of Propounder. Of the factors enumerated by our Supreme Court, only factors one and four support Caveators' argument that the Will was procured by the exercise of undue influence on the part of Propounder and his wife. Although these factors are not exclusive in proving undue influence in the execution of a document, we conclude that these factors as well as the entire "combination of facts, circumstances and inferences," *Andrews*, 299 N.C. at 56, 261 S.E.2d at 200, do not leave any issue of material fact to be resolved on the question of undue influence in the execution of the Will. Moreover, Caveators' evidence is

---

8. "When evidence of such statements by one other than the witness testifying is offered for a proper purpose other than to prove the truth of the matter asserted, it is not hearsay and is admissible." *State v. Coffey*, 326 N.C. 268, 282, 389 S.E.2d 48, 56 (1990).

9. Although Pauline's medical records from 19 March 2004 indicate that she was brought into the physician's office complaining of "several days of illness, a decreased appetite, some lethargy, weakness, and inability to stand[,]" subsequent medical records and testimony reflect that it was only after her fall seven weeks prior to her death that her health began to rapidly deteriorate and she became completely wheelchair-bound.

completely lacking in temporal specificity, and thus was insufficient to submit the issue of undue influence to the jury. Accordingly, Caveators' argument on this issue is overruled.

## D. Testamentary Capacity

**[4]** In their next argument, Caveators contend that the trial court erred in granting Propounder's motion for summary judgment on the issue of testamentary capacity. We disagree.

> An individual possesses testamentary capacity—the capacity to make a will—if the following is true: [She] (1) comprehends the natural objects of [her] bounty, (2) understands the kind, nature and extent of [her] property, (3) knows the manner in which [she] desires [her] act to take effect, and (4) realizes the effect [her] act will have upon [her] estate.

*Sechrest,* 140 N.C. App. at 473, 537 S.E.2d at 517. The presumption is that "every individual has the requisite capacity to make a will, and those challenging the will bear the burden of proving, by the greater weight of the evidence, that such capacity was wanting." *Id.*

> However, to establish testamentary incapacity, a caveator need only show that one of the essential elements of testamentary capacity is lacking. *In re Will of Kemp,* 234 N.C. 495, 499, 67 S.E.2d 672, 675 (1951). "It is not sufficient for a caveator to present 'only general testimony concerning testator's deteriorating physical health and mental confusion in the months preceding the execution of the will, upon which [a caveator] based [her] opinion[] as to [the testator's] mental capacity.' " *In re Will of Smith,* 158 N.C. App. 722, 725, 582 S.E.2d 356, 359 (2003) (citation omitted). A caveator needs to present specific evidence " "relating to testator's understanding of his property, to whom he wished to give it, and the effect of his act in making a will at the time the will was made." " *Id.* (citations omitted).

*In re Will of Priddy,* 171 N.C. App. 395, 397, 614 S.E.2d 454, 457 (2005).

In the present matter, Caveators submitted a video recording of the execution of the Will which they argue "shows a very confused 90 year old woman who is barely able to respond to her attorney's leading questions and who is not even aware how she is devising her estate." Caveators contend that the following exchange alone

between Pauline and Mr. Knox was sufficient to submit the issue of testamentary capacity to the jury:

[Mr. Knox:] I think you're leaving Donnie the balance of the farmland, is that correct?

[Pauline:] Well, I, that would be right, I reckon.

[Mr. Knox:] Okay, well, you can't reckon. I want to make certain that is what you're doing. I know you don't know how many acres are left, but—"

[Pauline:] No, I don't. I don't. I really don't know how many acres is [sic] left.

[Mr. Knox:] But other than the home place to Wayne and Harold and giving Bobby the approximately 14 acres, you will the balance of it to Donnie, is that correct? Did I confuse you by the way I asked the question? You're going to give the home place, the amount you surveyed out, the house, to Wayne and Harold. You're going to give Bobby about 14 acres, he's already gotten about 1 acre, is that correct? And the rest of the land that you own is going to Donnie?

[Pauline:] Yeah, what were they supposed to get to start with? 21 acres or 22 acres?

[Mr. Knox:] Well[.]

[Pauline:] But I thought Bobby and Donnie could just have Wayne and Bob—Harold's share.

[Mr. Knox:] OK, have you surveyed out Bobby's acreage, is that what you surveyed out? So you've surveyed out the 14 acres for Bobby, is that correct?

[Pauline:] Yeah, it's been—it's been surveyed.

[Mr. Knox:] So what I'm asking you is that you own a tract of land with a house on it, right?

[Pauline:] Yeah.

[Mr. Knox:] And that house you left to Wayne and Harold, and you surveyed out Bobby's 14 acres, and I want to make certain that you understand with no question that you're leaving Donnie who has an interest in the farm, the balance of the land.

[Pauline:] That might cause some confusion now.

SEAGRAVES v. SEAGRAVES

[206 N.C. App. 333 (2010)]

After reviewing the video of the foregoing exchange, we do not share Caveators' opinion that Pauline's statements are probative of her testamentary incapacity. This exchange alone is insufficient to establish that Pauline lacked testamentary capacity at the time she executed the Will. Furthermore, viewed in its entirety, the video does not support Caveators' argument. The continuing colloquy between Pauline and Mr. Knox reveals Pauline stating that she had told two of her sons how she planned to change her will and "they didn't like it." She also stated that Donald told Pauline not to execute a will while he was not there, and Pauline responded, "I think I'm a grown woman." Pauline stated under oath that she knew exactly what she was doing and that her Will contained her wishes for her property. Additionally, Pauline asked Mr. Knox, "Can they protest this and get anywhere?"

Mr. Knox testified in an affidavit that none of Pauline's family members were present when he personally examined Pauline, nor were they present when the Will was executed. Mr. Knox testified further that Pauline expressed to him "that her son, Donnie Seagraves, had looked after her since her husband died and that he had farmed the land his entire life. She indicated that two of her sons, Wayne and Harold, had moved away and she rarely saw them." Finally, Mr. Knox testified that he was "firmly convinced that on September 20, 2004, Pauline Seagraves was of sound mind and was acting of her own free will in executing her Last Will and Testament which set forth her wishes and desire for the disposition of her property." This evidence establishes testamentary capacity, not incapacity.

In addition to the video of the Will execution, Caveators contend the medical evidence discussed supra establishes that Pauline experienced "constant delusions." Contrary to Caveators' contention, however, the medical evidence presented in this matter falls short of establishing Pauline's mental incapacity. Viewed in the light most favorable to Caveators, the medical evidence establishes only that Pauline experienced an "altered level of awareness" when she was hospitalized on 16 April 2005, seven months after she executed the Will, but that her mental state returned to "baseline" the following day.

The only other evidence of Pauline's impaired mental state is the testimony of Linda Seagraves, in which Linda claims Pauline "would sometimes have delusions that she was being visited by her husband and would call Donnie 'Paul.' " Linda's testimony is unsupported by

specific details and is completely lacking in temporal specificity. Without more, such testimony is insufficient to establish Pauline's mental incapacity.

In *In re Estate of Whitaker*, 144 N.C. App. 295, 547 S.E.2d 853 (2001), the only evidence presented by the caveators to rebut the presumption of the testator's capacity was caveators' joint affidavit containing various statements regarding the testator's mental health. *Id.* at 299, 547 S.E.2d at 857. The caveators "presented only general testimony concerning testator's deteriorating physical health and mental confusion in the months preceding the execution of the will, upon which [caveators] based their opinions as to [her] mental capacity." *Id.* at 298, 547 S.E.2d at 857 (internal citation and quotation marks omitted). This Court held that "such evidence fail[ed] to show that a testatrix failed to recognize the natural object of her bounty where the evidence indicates that she not only acknowledged them as such, she explained . . . that she did not want to leave them anything. . . ." *Id.* at 300, 547 S.E.2d at 857 (internal citation and quotation marks omitted). Finally, we noted that the evidence established that the testator "knew the identity of her daughters, knew the identity of the caveators, and that Whitaker affirmatively expressed her desire to disinherit caveators because they 'had not done anything for her.' " *Id.*

As we held in *Whitaker*, Caveators' general testimony concerning Pauline's deteriorating health and mental confusion is insufficient to show that she lacked testamentary capacity at the time she executed her Will. Accordingly, Caveators' argument is overruled.

### E. Devisavit Vel Non

[5] Caveators also argue that the trial court erred in denying their motions for directed verdict and judgment notwithstanding the verdict on the issue of *devisavit vel non*. We disagree.

Pursuant to N.C. Gen. Stat. § 31-18.1(a)(4) (2009), an attested written will may be probated "[u]pon a showing that the will has been made self-proved in accordance with the provisions of G.S. [§] 31-11.6." "In order to make a will self-proving, there must be a notary's verification that (1) the testator signed the will in the notary's presence and declared it to be his or her last will and testament and (2) two persons witnessed the testator sign the will." In *re Will of Yelverton*, 178 N.C. App. 267, 271, 631 S.E.2d 180, 182 (2006).

At trial, Ms. Knox testified that she saw Pauline sign the Will, that the execution was witnessed by two attorneys in her office, and "then

SEAGRAVES v. SEAGRAVES

[206 N.C. App. 333 (2010)]

it was notarized by Amanda Walker, who was a paralegal in our firm at the time." Caveators contend that Propounder presented no evidence that Amanda Walker was a licensed notary public "authorized to administer oaths under the laws of the state where execution occurs." N.C. Gen. Stat. § 31-11.6 (2009).

Caveators, however, ignore Ms. Knox's testimony that "I do know of my own knowledge that Amanda Walker was one of our senior paralegals and was a notary in Mecklenburg County at that time and notarized numerous documents in our office." Furthermore, Ms. Knox testified that, "Well, I do know of a fact that she was a licensed notary, North Carolina at the time because we checked all of our notaries' certifications in our office." This testimony was sufficient to establish that Amanda Walker was authorized to administer oaths pursuant to N.C. Gen. Stat. § 31-11.6. As the qualification of the notary was Caveators' only challenge to the trial court's denial of their motions for directed verdict and judgment notwithstanding the verdict, Caveators' argument is overruled.

### F. Motion to Continue

[6] Finally, Plaintiff argues that the trial court erred in denying his motion to continue the trial on the claims involving the 8.9 acre deed so that Plaintiff could file an immediate appeal from the trial court's entry of partial summary judgment. The trial court denied Plaintiff's motion to continue in open court on 15 September 2008. Plaintiff did not appeal from the trial court's order, and thus Plaintiff has not preserved this issue for appellate review. N.C. R. App. P. 3(a). Accordingly, Plaintiff's argument is dismissed.

### III. Conclusion

For the foregoing reasons, the order of the trial court in 07 CVD 96 is reversed, and the order and judgment of the trial court in 06 E 616 are affirmed.

REVERSED in part; AFFIRMED in part.

Judges HUNTER, JR. and BEASLEY concur.