STEVEN GEORGE, Administrator of the Estate of ALBERT GEORGE[,] and JUDY CANFIELD, Plaintiffs v. GREYHOUND LINES, INC. and ANTONIO FORD, Defendants

No. COA10-512

(Filed 15 March 2011)

**1. Damages and Remedies— punitive damages—motion to dismiss—compensatory damages**

The trial court did not err by denying defendants' motion to dismiss plaintiff's appeal based on plaintiff's alleged abandonment of her punitive damages claims by electing to proceed to trial on the issue of compensatory damages after dismissal of the punitive damages claim. Instead of dismissing plaintiff's appeal in order to comply with N.C.G.S. § 1D-30, the case would be remanded for a new trial on all issues including liability for compensatory damages if plaintiff's appeal was successful.

**2. Civil Procedure— motion for partial summary judgment— proper legal standard**

The trial court did not apply an incorrect legal standard when ruling on defendants' motion for partial summary judgment. While the trial court did not specifically state that defendants had first met their burden to show the lack of a triable issue of fact, it was implicit in the trial court's statement that it heard the arguments of counsel and then considered plaintiff's forecast of evidence.

**3. Damages and Remedies— punitive damages—partial summary judgment—willful and wanton conduct**

The trial court did not err in an action arising out of an automobile accident by granting partial summary judgment for defendants on the issue of whether defendants' conduct was willful or wanton. While the evidence was sufficient to show that the bus driver fell asleep while driving the bus, inadvertent driver error caused by falling asleep behind the wheel by itself did not support an award of punitive damages. Thus, there was also an insufficient forecast of evidence that the bus company participated in or condoned the bus driver's alleged willful or wanton conduct.

Appeal by Plaintiff Judy Canfield from order entered 26 January 2009 and judgment entered 25 January 2010 by Judge Milton F. Fitch, Jr. in Wilson County Superior Court. Heard in the Court of Appeals 3 November 2010.

*The Kessler Law Firm, P.L.L.C., by Christopher C. Kessler and Phillip T. Evans, for Plaintiff-Appellant.*

*Young Moore and Henderson, P.A., by Brian O. Beverly, David M. Duke, and Michael S. Rainey, for Defendants-Appellees.*

STEPHENS, Judge.

## I. Procedural History

On 30 June 2003, Albert George and Judy Canfield (collectively, "Plaintiffs") were injured when the recreational vehicle ("RV") in which they were traveling was struck in the rear by a bus operated by Antonio Ford ("Ford") and owned by Greyhound Lines, Inc. ("Greyhound") (collectively, "Defendants"). On 29 June 2005, Plaintiffs filed this action against Defendants seeking compensatory and punitive damages.

Defendants moved "to bifurcate the trial of the issues of liability for punitive damages and the amount of punitive damages, if any, from the issue of the amount of compensatory damages." On 30 July 2008, Defendants filed a motion for partial summary judgment on Plaintiffs' claim for punitive damages. Defendants' motion was heard on 26 January 2009 by the Honorable Milton F. Fitch, Jr. By order entered that day, the trial court granted Defendants' motion.

The case proceeded to trial on 26 January 2009. On 30 January 2009, the jury returned a verdict awarding Plaintiff Stephen George, as administrator of the estate of Albert George, $6,500 for personal injuries and $1,000 for property damage and awarding Judy Canfield ("Canfield") $60,000 for personal injuries and $11,000 for property damage.

On 24 February 2009, Canfield filed notice of appeal from the order granting Defendants' motion for partial summary judgment. By order entered 29 September 2009, this Court dismissed Canfield's appeal as interlocutory.

On 25 January 2010, judgment was entered on the jury verdict rendered 30 January 2009.[1] From the order granting partial summary judgment to Defendants and the judgment entered on the jury verdict, Canfield appeals. For the reasons stated herein, we affirm the trial court's order and judgment.

---

1. There is no explanation in the record for the year-long delay between rendering of the jury's verdict and entry of the court's judgment thereon.

## II. Factual Background

Ford recounted his version of the events leading up to the accident in a handwritten statement he gave to a highway patrolman. In that statement, Ford wrote:

> I was driving up I-95 south at approx[imately] 5:00 a.m. Myself and another vehicle about a half mile in front of me moved to the left lane to pass a vehicle heading right lane [sic]. As I approached the vehicle on the right, I noticed the vehicle in the left had either slowed or stopped. There were no brake lights to indicate stopping. It was still dark so I could not see that the vehicle had stopped in the left lane. To avoid hitting the car, I tried to move back into the right lane to get on the emergency lane to pass the vehicle in the right lane. The next thing I see is debris hitting the windshield and the back of a camper.

Ford recounted a similar sequence of events involving a third vehicle in a telephone call he made to Greyhound from the scene of the accident; in an internal form he filled out and submitted to Greyhound; in his answers to interrogatories; and in his deposition testimony.

The investigating officer's official report does not mention a third vehicle's involvement in the accident. Likewise, David Faas, a passenger on the bus at the time of the accident, testified at deposition that both the RV and the bus were in the right lane, and there was no other traffic around. Faas testified that as the bus came up behind the RV, a passenger in front of him started yelling, " 'Whoa, whoa.' " Faas then yelled, " 'Whoa, whoa.' " A third passenger behind Faas also yelled out, " 'Whoa[.]' " According to Faas, the bus crashed into the rear of the RV without hitting the brakes, changing lanes, or making any other evasive maneuver.

## III. Discussion

### A. Defendants' Motion to Dismiss

[1] We first address Defendants' motion to dismiss Canfield's appeal because Canfield "abandoned her punitive damages claims by electing to proceed to trial on the issue[] of compensatory damages *after* dismissal of the punitive damages claim[.]" We disagree.

Pursuant to N.C. Gen. Stat. § 1D-30,

> [u]pon the motion of a defendant, the issues of liability for compensatory damages and the amount of compensatory dam-

ages, if any, shall be tried separately from the issues of liability for punitive damages and the amount of punitive damages, if any. Evidence relating solely to punitive damages shall not be admissible until the trier of fact has determined that the defendant is liable for compensatory damages and has determined the amount of compensatory damages. The same trier of fact that tried the issues relating to compensatory damages shall try the issues relating to punitive damages.

N.C. Gen. Stat. § 1D-30 (2009).

On 26 January 2009, Defendants' motion for partial summary judgment on the issue of punitive damages was granted. The case proceeded to trial on the issue of compensatory damages on 26 January 2009. On 24 February 2009, Canfield appealed the trial court's grant of partial summary judgment. On 29 September 2009, this Court dismissed the appeal as interlocutory. Although the jury returned its verdict on 30 January 2009, judgment was not entered on the jury verdict until 25 January 2010. Canfield now appeals from both the partial summary judgment order and the judgment.

Defendants argue that Canfield's appeal should be dismissed because, pursuant to N.C. Gen. Stat. § 1D-30, Canfield's punitive damages claim could not be tried by a different jury from the jury that heard Canfield's compensatory damages claim. Defendant's argument misapprehends the law. Instead of dismissing Canfield's appeal in order to comply with section 1D-30, "we are required to remand for a new trial on *all* issues, including *liability* for compensatory damages" if Canfield's appeal is successful. *Lindsey v. Boddie-Noell Enters.*, 147 N.C. App. 166, 177, 555 S.E.2d 369, 376 (2001), *reversed on other grounds*, 355 N.C. 487, 562 S.E.2d 420 (2002).

Accordingly, Defendants' motion to dismiss this appeal is denied.

*B. Canfield's Appeal of Partial Summary Judgment*

*1. Legal Standard Applied*

[2] Canfield first argues that the trial court applied the incorrect legal standard in ruling on Defendants' motion for partial summary judgment. We disagree.

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law."

N.C. Gen. Stat. § 1A-1, Rule 56(c) (2009). " 'When considering a motion for summary judgment, the trial judge must view the presented evidence in a light most favorable to the nonmoving party.' " *In re Will of Jones*, 362 N.C. 569, 573, 669 S.E.2d 572, 576 (2008) (*quoting Dalton v. Camp*, 353 N.C. 647, 651, 548 S.E.2d 704, 707 (2001)). The moving party has the burden "to show the lack of a triable issue of fact and to show that he is entitled to judgment as a matter of law." *Moore v. Crumpton*, 306 N.C. 618, 624, 295 S.E.2d 436, 441 (1982). "The movant may meet this burden by proving that an essential element of the opposing party's claim is nonexistent, or by showing through discovery that the opposing party cannot produce evidence to support an essential element of his claim or cannot surmount an affirmative defense which would bar the claim." *Collingwood v. General Electric Real Estate Equities, Inc.*, 324 N.C. 63, 66, 376 S.E.2d 425, 427 (1989). If the defendant meets this burden, then the plaintiff must "produce a forecast of evidence demonstrating that the plaintiff will be able to make out at least a *prima facie* case at trial." *Id.* This Court reviews a trial court's entry of summary judgment *de novo. Builders Mut. Ins. Co. v. N. Main Constr., Ltd.*, 361 N.C. 85, 88, 637 S.E.2d 528, 530 (2006).

"Punitive damages may be awarded . . . to punish a defendant for egregiously wrongful acts and to deter the defendant and others from committing similar wrongful acts." N.C. Gen. Stat. § 1D-1 (2009). In order for punitive damages to be awarded, a claimant must prove by clear and convincing evidence an aggravating factor of fraud, malice, or willful or wanton conduct. N.C. Gen. Stat. § 1D-15 (2009). "The clear and convincing evidence standard is greater than a preponderance of the evidence standard required in most civil cases, and requires evidence which should fully convince." *Schenk v. HNA Holdings, Inc.*, 170 N.C. App. 555, 560, 613 S.E.2d 503, 508 (internal citations and quotation marks omitted), *disc. review denied*, 360 N.C. 177, 626 S.E.2d 649 (2005).

At the summary judgment hearing, the trial court stated the following:

> After hearing the argument on the issue of whether or not there should be a partial summary judgment, the Court is aware of what the standard is, that it must be by clear and convincing evidence justifying a finding of willful and wanton behavior on behalf of the driver, Antonio Ford, and Greyhound Line[s], Inc.

After hearing the arguments of Counsel and the forecast of the Plaintiff as to [her] evidence, the Court will grant partial summary judgment on this particular summary judgment in this particular matter on behalf of both Greyhound and Antonio Ford.

Canfield argues that these remarks indicate the trial court incorrectly placed the burden of proof upon her to put forth at the summary judgment hearing " 'clear and convincing evidence justifying a finding of willful and wanton behavior on behalf of the driver, Antonio Ford, and Greyhound Line[s], Inc.' " We disagree with Canfield's characterization of the trial court's statements.

The trial court first stated that it was "aware" that in order for punitive damages to be awarded at trial, Canfield must prove by "clear and convincing evidence" willful or wanton conduct. This is a correct statement of the law. *See* N.C. Gen. Stat. § 1D-15. The trial court then determined that Canfield had failed to produce a forecast of evidence to make out at least a *prima facie* case for an award of punitive damages at trial. *See Builders Mut. Ins. Co.*, 361 N.C. at 88, 637 S.E.2d at 530. While the trial court did not specifically state that Defendants had first met their burden to show the lack of a triable issue of fact, *see Moore*, 306 N.C. at 624, 295 S.E.2d at 441, this is implicit in the trial court's statement that it heard the arguments of counsel and then considered Canfield's forecast of evidence.

Accordingly, we conclude that the trial court did not apply the incorrect legal standard in granting Defendants' motion for partial summary judgment. Canfield's argument is overruled.

### 2. Grant of Partial Summary Judgment

[3] Canfield next argues that the trial court erred in granting partial summary judgment for Defendants because there were genuine issues of material fact as to whether Defendants' conduct was willful or wanton. We disagree.

"Punitive damages are allowable for injuries caused by the willful or wanton operation of a motor vehicle." *Marsh v. Trotman*, 96 N.C. App. 578, 580, 386 S.E.2d 447, 448 (1989), *disc. review denied*, 326 N.C. 483, 392 S.E.2d 91 (1990). " 'Willful or wanton conduct' means the conscious and intentional disregard of and indifference to the rights and safety of others, which the defendant knows or should know is reasonably likely to result in injury, damage, or other harm. 'Willful or wanton conduct' means more than gross negligence." N.C. Gen. Stat. § 1D-5(7) (2009). "An act is willful when there is a deliber-

ate purpose not to discharge a duty, assumed by contract or imposed by law, necessary for the safety of the person or property of another." *Lashlee v. White Consol. Indus., Inc.*, 144 N.C. App. 684, 694, 548 S.E.2d 821, 827, *disc. review denied*, 354 N.C. 574, 559 S.E.2d 179 (2001). "A wanton act is an act done with a 'wicked purpose or . . . done needlessly, manifesting a reckless indifference to the rights of others.' " *Id.* at 693-94, 548 S.E.2d at 827 (*quoting Benton v. Hillcrest Foods, Inc.*, 136 N.C. App. 42, 51, 524 S.E.2d 53, 60 (1999)).

Canfield's claim for punitive damages is based on allegations that Ford knew or should have known that he was overtired, sleepy, or otherwise not fit to operate the bus; that he continued to operate the bus and failed to remain awake and alert immediately prior to the collision; and that he fell asleep while operating the bus, causing the collision. Canfield also alleges that Greyhound knew or should have known that Ford was overtired, sleepy, or otherwise not fit to operate the bus. Canfield alleges that Ford's and Greyhounds's conduct violated the following Federal Motor Carrier Safety Administration Regulation:

> No driver shall operate a commercial motor vehicle, and a motor carrier shall not require or permit a driver to operate a commercial motor vehicle, while the driver's ability or alertness is so impaired, or so likely to become impaired, through fatigue, illness, or any other cause, as to make it unsafe for him to begin or continue to operate the commercial motor vehicle.

49 CFR 392.3 (2009).

We first note that while "the violation of a safety regulation . . . may establish negligence *per se* in a civil trial in certain circumstances[,]" *Mosteller v. Duke Energy Corp.*, —— N.C. App. ——, ——, 698 S.E.2d 424, 432 (2010), the violation of a safety statute or regulation does not establish *willful* conduct *per se*. Instead, there must be sufficient evidence of a "*deliberate purpose* not to discharge a duty" imposed by the safety regulation. *Lashlee*, 144 N.C. App. at 694, 548 S.E.2d at 827 (emphasis added).

The following forecast of evidence was relevant to the issue of willful or wanton conduct:

### 1. David Faas

Faas testified at deposition that he was seated along the aisle on the left side of the bus and saw the collision take place. He said that

both the RV and the bus were in the right lane, and there was no other traffic around. As the bus came up behind the RV, a passenger in front of him started yelling, " 'Whoa, whoa.' " Faas then yelled, " 'Whoa, whoa.' " A third passenger behind Faas also yelled out, " 'Whoa[.]'". The bus crashed into the rear of the RV without hitting the brakes, changing lanes, or making any other evasive maneuver.

When Faas was asked how many people were awake on the bus at the time of the accident, Faas stated, "I know us three were. I can't say if the bus driver was or not. There was only—in my opinion, there was only three people awake, and the bus driver wasn't one of them." When asked specifically if he thought the bus driver was asleep, Faas responded, "He was either asleep or he wasn't paying attention."

Faas also testified that he observed Ford's operation of the bus for approximately 30 minutes before the collision and that during this time, Ford's driving was perfectly normal.

## 2. Jahan Hafshejani

Jahan Hafshejani submitted an affidavit in which he stated that he was a passenger on the bus and was awake prior to and at the time of the collision. He was seated approximately four or five rows behind the driver, on the opposite side of the aisle. Hafshejani stated that he called out to warn the bus driver of the impending collision. Although Hafshejani was not looking at Ford immediately before or at the time of the accident, it was his opinion that "the bus driver fell asleep at the wheel causing the collision." Hafshejani stated that from the time he boarded the bus in Richmond, Virginia until the time the accident occurred near Rocky Mount, North Carolina, "the bus was driving normal."

## 3. Judy Canfield

Canfield testified at deposition that a couple of passengers walked by her after the accident and said that their bus driver was falling asleep and they were screaming to wake him up.

## 4. Antonio Ford

Ford testified at deposition that he did not remember when he had slept or worked or what bus runs he had been on during the week leading up to the accident. He further testified that he was off during the day of 29 June 2003, "so I don't, really don't even know what I did." Ford was asked, "From the 28th, the day before, to the 29th[,]

did you sleep that night?" Ford responded, "I don't even know what I did on the 28th. Can't recall what I did on the 28th, you know."

Ford was asked numerous times if "it might be some day[s] you sleep during the day, some days you sleep a normal nighttime sleep[?]" Ford acknowledged this, but explained that he was used to the schedule and had been doing it for ten years. Ford was then asked if he would "agree that that would be taxing on the human body with being fatigued, not having a regular sleep/work schedule?" Ford responded, "I'm not going to agree to that. I mean for you maybe, but for somebody that does it every day, we know how to sleep."

During the 43 hours that Ford was off work before beginning his 1:00 a.m. run on 30 June 2003, Ford either placed or received 77 phone calls. When Ford reported for duty sometime after midnight on 20 June 2003, he reported to no one at the terminal and no one from Greyhound observed him before he departed the station.

### 5. Alex Guariento

Alex Guariento, the Vice President of Safety and Security for Greyhound, was responsible for policy and safety procedures for occupational and fleet safety and security for Greyhound in North America. He acknowledged at his deposition that as a commercial motor carrier, Greyhound must abide by the Federal Motor Carrier Safety Administration Regulations.

Guariento explained that Greyhound does not personally observe all drivers for impairment due to fatigue before permitting them to begin or continue their runs and that Greyhound has never considered having every driver observed in person before permitting them to begin their runs.

Guariento testified that it is possible Ford could have reported to work the morning of 30 June 2003 without having had sufficient rest, but Guariento did not know how much sleep Ford had gotten before beginning the run that ended in the collision.

An internal Greyhound memo authorized by Guariento indicates that inverting the sleep/awake cycle during off days "invites trouble when returning to work, as our internal clock needs time to readjust." The memo also indicates that during the early morning hours from 2 a.m. to 6 a.m., people are more at risk of falling asleep, particularly if they have not had enough rest before returning to work.

Canfield argues that Ford's testimony[2] regarding his sleeping habits before reporting to work on 30 June 2003 "was some evidence that [] Ford was fatigued when he began his run that ended in the crash[.]" We do not agree. Although Canfield's attorney attempted to elicit testimony from Ford at his deposition to show that Ford's sleeping habits caused him to be fatigued when he started his run on 30 June 2003, no such evidence was actually elicited. Instead, Ford's testimony tends to show that he was accustomed to his sleeping patterns and was not fatigued as a result of them.

Moreover, while the pleadings, depositions, answers to interrogatories, and affidavits may be sufficient to show that Ford fell asleep while driving the bus, inadvertent driver error caused by falling asleep behind the wheel *by itself* does not support an award of punitive damages. *See Marsh*, 96 N.C. App. at 581, 386 S.E.2d at 448 (evidence was sufficient to support an award of punitive damages based on defendant's willful and wanton operation of a motor vehicle and did *not* establish as a matter of law "that defendant [] was *merely inadvertent*—either by failing to observe the approaching vehicles or the lay of the highway, by failing to control the vehicle, by failing to drive on the right half of the highway, *or perhaps even by dropping off to sleep* . . . .") (emphasis added). There is no evidence that Ford acted with a "deliberate purpose" not to discharge any duty imposed by 49 CFR 392.3 or acted with a "reckless indifference" to the rights of others by talking on the telephone and failing to get sufficient rest before beginning his run on 30 June 2003. On the contrary, at most the evidence establishes that Defendant was merely inadvertent by dropping off to sleep. Accordingly, we conclude that Canfield failed to produce a forecast of evidence sufficient to support a claim for punitive damages against Ford. Thus, the trial court did not err in granting summary judgment in favor of Ford on Canfield's punitive damages claim.

## 2. Greyhound

Punitive damages may not be awarded against a party solely on the basis of vicarious liability for the acts or omissions of another. N.C. Gen. Stat. § 1D-15(c). Moreover, punitive damages may only be awarded against a corporation if "the officers, directors, or managers of the corporation participated in or condoned the conduct constituting the aggravating factor giving rise to punitive damages." *Id.*

---

2. Canfield tends to mischaracterize her attorney's questions during deposition as being Ford's testimony.

Canfield contends that Greyhound is "intentionally non-compliant" with the Federal Motor Carrier Safety Administration Regulations by "consciously and intentionally not observing its drivers before departing on runs[.]" We disagree. Because we conclude that Canfield offered an insufficient forecast of evidence that Ford engaged in willful or wanton conduct, we likewise conclude that there was an insufficient forecast of evidence that Greyhound "participated in or condoned" Ford's alleged willful or wanton conduct. Accordingly, the trial court did not err in granting summary judgment in favor of Greyhound on Canfield's punitive damages claim.

The order and judgment of the trial court are

AFFIRMED.

Judges STEELMAN and HUNTER, JR. concur.