IN THE COURT OF APPEALS OF NORTH CAROLINA

No. COA25-751

Filed 18 March 2026

Mecklenburg County, No. 24CV007273-590

CATHERINE BARR and DUSTIN BARR, Plaintiffs,

v.

HOLTON CONSTRUCTION CONCEPTS, LLC, Defendant.

Appeal by defendant from order entered 19 April 2025 by Judge Peter B. Knight in Mecklenburg County Superior Court. Heard in the Court of Appeals 10 February 2026.

*Anderson, Johnson, Lawrence & Butler, LLP, by Steven C. Lawrence and Charles R. Smith, for defendant-appellant.*

*TLG Law, by David G. Redding and Sean A. McLeod, for plaintiffs-appellees.*

GORE, Judge.

This appeal arises from a residential construction dispute. Defendant HolTon Construction Concepts, LLC ("Holton") appeals from an order granting summary judgment in favor of plaintiffs Catherine and Dustin Barr ("the Barrs") on Holton's counterclaim for breach of contract.

The sole issue before this Court is whether the trial court erred in granting summary judgment on Holton's counterclaim. We hold that it did not. Holton lacked authority under Chapter 87 of the North Carolina General Statutes to undertake this project, and its subsequent license upgrade cannot retroactively validate a contract

that exceeded its authorized limit at formation. Accordingly, we affirm.

Jurisdiction lies in this Court pursuant to N.C.G.S. § 7A-27(b).

**I.**

In late 2021, the Barrs began searching for a general contractor to build a home on their property. They were introduced to Holly Edwards, the principal of Holton. At their initial meeting, the Barrs provided Edwards with construction plans and design specifications for the project, with an initial budget of $1,700,000.

On 15 March 2022, the parties executed a construction contract (the "Contract") for a total price of $1,870,000. The Contract allocated $1,000,000 to construction of the residence and $870,000 to construction of a detached garage. Both structures were to be built on the same parcel of land and funded through a single construction loan from TD Bank.

At the time the Contract was executed, Holton held an intermediate general contractor's license authorizing it to act as general contractor on projects valued up to $1,000,000. On 20 December 2022, Holton upgraded to an unlimited license.

The Contract provided that any modifications to the contract price required a written change order signed by both parties. No written change orders were executed during the project.

Construction proceeded, and on 15 November 2023 a certificate of occupancy was issued for the property. The Barrs moved into the residence on 20 November 2023. By that time, TD Bank had fully disbursed the $1,870,000 contract price.

Before the final disbursement, on 15 November 2023, the Barrs signed a Final Lien Waiver presented by Holton, in which Holton represented that it and all subcontractors had been paid for work performed on the project. Holton's internal accounting records reflect that it expended approximately $1,758,504 on the project.

In early 2024, several subcontractors submitted claims asserting they had not been paid in full. On 4 March 2024, the plumbing subcontractor recorded a claim of lien against the property.

The Barrs filed this action the same day, asserting claims including breach of contract, fraud, negligent misrepresentation, and unfair and deceptive trade practices. Holton asserted counterclaims, including breach of contract, alleging that the Barrs caused cost overruns and failed to pay amounts allegedly owed to subcontractors. Holton later dismissed all counterclaims except breach of contract.

The Barrs moved for summary judgment on Holton's remaining counterclaim. On 29 April 2025, the trial court granted partial summary judgment in favor of the Barrs, dismissing Holton's breach of contract counterclaim. On 6 May 2025, the Barrs voluntarily dismissed their claims pursuant to Rule 41(a)(1). Holton timely appealed.

**II.**

"Our standard of review of an appeal from summary judgment is de novo; such judgment is appropriate only when the record shows that there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of

law." *In re Will of Jones*, 362 N.C. 569, 573 (2008) (cleaned up).

The moving party "bears the initial burden of demonstrating the absence of a genuine issue of material fact." *Liberty Mut. Ins. Co. v. Pennington*, 356 N.C. 571, 579 (2002). If the moving party satisfies this burden, the nonmoving party must respond with a forecast of evidence demonstrating specific facts from which a prima facie case could be established at trial. *Gaunt v. Pittaway*, 139 N.C. App. 778, 784–85 (2000).

## III.

North Carolina's General Contractor Licensing Act, N.C. Gen. Stat. § 87-1 *et seq.*, establishes a comprehensive regulatory scheme designed "to protect the public from incompetent builders." *Builders Supply v. Midyette*, 274 N.C. 264, 270 (1968). The Act requires that any person who undertakes to construct a building where the cost of the undertaking is $40,000 or more must hold an appropriate general contractor's license. N.C.G.S. § 87-1.

The licensing statute establishes three tiers of licensure. At the time relevant to this appeal, an intermediate license authorized a contractor to act as general contractor on any single project valued up to $1,000,000. N.C.G.S. § 87-10(a1) (2021). An unlimited license carried no such restriction. *Id.*

North Carolina courts apply a "bright line" rule requiring strict compliance with these licensing provisions. *Dellinger v. Michal*, 92 N.C. App. 744, 747 (1989) (quoting *Sample v. Morgan*, 311 N.C. 717, 723 (1984)). In *Brady v. Fulghum*, our

Supreme Court held that "a contract illegally entered into by an unlicensed general construction contractor is unenforceable by the contractor. It cannot be validated by the contractor's subsequent procurement of a license." 309 N.C. 580, 586 (1983).

The question presented is whether this rule applies where a contractor holds a valid license but undertakes a project exceeding the license's monetary limitation.

**A.**

It is undisputed that when the Contract was executed on 15 March 2022, Holton held an intermediate license authorizing projects up to $1,000,000. It is equally undisputed that the Contract obligated Holton to construct both a residence and a garage on the same parcel for a combined price of $1,870,000.

Under 21 N.C. Admin. Code 12.0211, "all structures and units on the same parcel of land shall be considered as a single project." Holton cannot avoid this rule by characterizing the Contract as two separate undertakings. *Hodgson Const., Inc. v. Howard*, 187 N.C. App. 408, 414 (2007) (rejecting the argument that a contractor may "circumvent the consumer protections of Chapter 87 by stringing together piecemeal contracts for different phases of the construction of a single building").

Accordingly, the Contract constituted a single undertaking valued at $1,870,000—nearly double Holton's $1,000,000 license limitation. Holton lacked authority under Chapter 87 to undertake this project as a general contractor.

**B.**

Holton argues that its upgrade to an unlimited license on 20 December 2022

brought it into compliance with Chapter 87 and permits enforcement of the Contract. Holton relies principally on *Dellinger*, in which this Court stated that "competence" under Chapter 87 "is measured by the extent of the contractor's license" and that courts should "look to see whether the construction was by one licensed while performing the work." 92 N.C. App. at 747.

*Dellinger* does not support Holton's position. In that case, the contractor entered a cost-plus contract providing that "[t]he cost of the house will be figured on a cost plus 10% basis with a ceiling of $186,880.00." *Id.* at 745. The contractor held a $175,000 limited license at formation. *Id.* The final construction cost—$237,259— exceeded the license limit only because of "changes and additions . . . made to the contract after plaintiff began construction." *Id.* Critically, the contractor upgraded to an unlimited license just two months after execution, having performed only approximately $2,800 of work under the limited license. *Id.* at 746.

Under those circumstances, this Court held that "the value of the work done by plaintiff was never in excess of his license limit" and that the contractor "should be allowed to prove his case." *Id.* at 747.

*Dellinger* involved a contract that did not obligate the contractor to exceed his license limit at formation. The contract price was indeterminate—to be "figured" based on actual costs—and the stated ceiling exceeded the license limit by a modest amount. *Id.* at 745. The cost overruns resulted from owner-requested changes after the work began, and the contractor upgraded promptly before performing substantial

work under the limited license.

Here, by contrast, Holton made a definite commitment at formation to undertake a $1,870,000 project—87% above its $1,000,000 license limitation. There was no indeterminacy in the contract price. Holton did not upgrade until nine months after execution, during which time substantial construction work occurred. This is not a case where unforeseen cost increases pushed a lawful contract beyond the license limit; this is a case where the contractor knowingly undertook a project far exceeding its authorized capacity from the outset.

Our holding does not disturb *Dellinger*. It simply recognizes that *Dellinger* presupposes a contract that is lawful at formation. Where, as here, the contractor lacks authority under Chapter 87 to undertake the project at formation, the contract is unenforceable and cannot be cured by a subsequent license upgrade. To hold otherwise would permit contractors to contract first and upgrade later—precisely the outcome Chapter 87's strict compliance rule is designed to prevent.

**C.**

Holton raises several additional arguments, none of which alter our analysis.

First, Holton contends that *Brady* applies only to "unlicensed" contractors and not to contractors who hold some license but exceed its limits. This is a distinction without a difference. A contractor with a $1,000,000 license who undertakes a $1,870,000 project lacks the required license for that project. The statutory scheme does not authorize partial compliance; it requires that the contractor hold a license

appropriate to the undertaking. *See Sample*, 311 N.C. at 722 (explaining that "the legislature reasonably determined that as the cost of a structure increased, there would be additional demands of expertise and responsibilities from the contractor").

Second, Holton argues that the Contract should be characterized as "cost-plus" rather than "fixed-price," creating ambiguity that precludes summary judgment. This argument misses the point. Regardless of how the Contract allocated risk for cost overruns, the undisputed contract price at formation was $1,870,000. That figure exceeded Holton's license authority. Whether the Contract was "fixed-price" or "cost-plus" does not change the amount Holton undertook to perform.

Because Holton lacked authority under Chapter 87 to undertake this project at formation, its breach of contract counterclaim is unenforceable as a matter of law. The trial court properly granted summary judgment on this ground.

## IV.

Even if the licensing bar did not apply, the trial court's grant of summary judgment would be proper on alternative grounds.

### A.

The Contract expressly provided that any modifications to the contract price required a written change order signed by both parties. It is undisputed that no written change orders were executed. Holton has not identified any contractual mechanism entitling it to compensation beyond the fully paid contract price.

Holton argues that the Barrs' conduct—allegedly requesting upgrades and

causing delays—waived the written change order requirement. But Holton did not develop this argument below with the specificity required to survive summary judgment. *See Gaunt*, 139 N.C. App. at 784–85. A nonmoving party must forecast specific facts, not mere allegations. Holton has not identified which alleged modifications were requested, when they occurred, what the additional costs were, or how the Barrs' conduct manifested an intent to waive the contractual requirement.

**B.**

To establish a breach of contract claim, a party must prove damages resulting from the breach. *Poor v. Hill*, 138 N.C. App. 19, 26 (2000). The undisputed record shows that Holton received the full $1,870,000 contract price and, according to its own internal accounting, expended approximately $1,758,504 on the project.

Holton's damages theory rests entirely on amounts allegedly owed to subcontractors. But Holton has not paid these amounts, nor has it demonstrated any legal obligation requiring it to do so. The record contains no judgment, settlement, or contract establishing Holton's liability to any subcontractor. Holton cannot establish damages by pointing to third-party claims it has not satisfied and may never be required to satisfy.

**C.**

Holton argues for the first time on appeal that its counterclaim rests on the Barrs' alleged late payments and resulting contractual late fees. Issues not raised before the trial court will not be considered on appeal. *Westminster Homes, Inc. v.*

*Town of Cary Zoning Bd. of Adjustment*, 354 N.C. 298, 309 (2001).  The record reflects that Holton's counterclaim and opposition to summary judgment focused on alleged subcontractor debts and cost overruns—not late payments.  This argument is not properly before us.

## V.

For the foregoing reasons, the trial court's order granting summary judgment on Holton's breach of contract counterclaim is affirmed.

AFFIRMED.

Judges ARROWOOD and CARPENTER concur.